**Ralph M. GIGOWSKI and Arlyn Gigowski, Appellants,**

v.

**Harold G. RUSSELL and Edward J. Mulligan, Individually and as Representatives of Other Property Owners, Sections I and II Harbor Point Subdivision of Henderson County, Appellees.**

No. 12–83–0193–CV.

Court of Appeals of Texas, Tyler.

June 5, 1986.

Rehearing Denied July 28, 1986.

Paul Wieneskie, Cribbs, McFarland, & Holman, Robert McFarland, Cribbs, McFarland, & Holman, Arlington, for appellants.

Henry T. Skelton, Kugle, Douglas & Skelton, Athens, for appellees.

BILL BASS, Justice.

This is an appeal from a permanent injunction ordering the removal of the appellant Gigowskis' double wide mobile home or sectional manufactured home from a lot in Section II of Harbor Point, a part of the subdivision restricted against "any kind of mobile home." The suit was brought by Harold G. Russell and Edward J. Mulligan, individually and as representatives of the other property owners in the subdivision. The Harbor Point Property Owners Association, Inc. also intervened seeking the removal of the Gigowski home from the subdivision. We affirm.

The resolution of this appeal turns principally upon whether the Gigowskis' residence is a mobile home within the meaning of the restrictive covenant. In their first two points of error the Gigowskis argue that the trial court applied an irrelevant statutory definition of "mobile home" and therefore erroneously concluded that the structure was a mobile home and not a manufactured home as they contend. They further contend in points three and four that the court failed to construe the term mobile home according to its plain meaning at the time of the covenant. Therefore, they maintain in points five and six that the court erred in concluding that the Gigowskis' home violated the restrictive covenant, and that it abused its discretion in granting the permanent injunction.

The Gigowskis purchased their home in 1979 for approximately $42,000 from its manufacturer, Overland Manufacturing, Inc. It was built in two 14' x 66' sections. Each section has a permanent chassis of two steel I-beams to which wheels and axles were attached so that the sections might be separately towed. Upon its delivery to the lot in Harbor Point, the tongue, axles, and wheels were removed, the two sections were joined, placed on cinder blocks and connected to utilities. The structure was further secured by tie-down cables going over its top and anchored in the ground at each side. Mr. Gigowski added wooden decks to both the front and the back of the house. Since the structure has a strong permanent chassis, it is designed to be moved again by the reattachment of the tongue, axles, and wheels. In the case of the Gigowski house, another move would necessarily require damage to the decks added after its location on the lot. These were added, it should be noted, after the Gigowskis were well aware of the developer's misgivings and their neighbors' dissatisfaction with the location of the home in Section II of Harbor Point. There is no dispute that it is spacious, sturdily constructed, comfortable, and very well maintained. The restriction in question read as follows:

6. No basement, tent, garage or other outbuilding shall be occupied or used as a residence, temporarily or permanently. No camping trailer, camper, trailer home, any type mobile home, houseboat, or ve-

hicle with living accommodations shall be used for, or in conjunction with, a residence or dwelling, either temporarily or permanently, and, with the exception of boat trailers, campers and camping trailers, shall not be parked on such premises at any time.

In construing a restrictive covenant, as in construing any written instrument, the court's first duty is to seek the intention of the parties to the end that their purpose may be effectuated. *Couch v. Southern Methodist University*, 10 S.W.2d 973, 973 (Tex.Comm'n App.1928, judgment adopted). The meaning of the words used must be determined as of the date the covenant was written, and not as of some subsequent date. *Davis v. Huey*, 620 S.W.2d 561, 567 (Tex.1981). The principal thrust of appellants' argument is that structures such as the Gigowskis' were beyond the "state of the art" in 1967 when the Harbor Point restrictions were filed and therefore their exclusion could not have been contemplated by the draftsman of the covenant. The restrictive covenant antedates the spectacular rise in the construction cost of traditional housing that resulted in the widely increased popularity and importance of manufactured housing. They urge that the mobile homes of that time were flimsy and unsightly aluminum shells; they were intended to be moved many times and were chiefly intended for transients. The restriction, in their view, was drafted before the advent of regulatory legislation affecting the industry when mobile homes were justifiably considered "transient eyesores." On the other hand, they contend, the Gigowski home was manufactured in strict compliance with state and federal regulatory legislation. It is sturdier, roomier, safer, and more comfortable than the earlier structures whose shoddy construction and general ugliness they concede justifiably gave rise to the public prejudice against mobile homes.

The Gigowskis contend that, in reaching its decision, the trial court improperly relied upon the definition of mobile home contained in the Texas Manufactured Housing Standards Act as it read at the time of trial in November of 1981.[1] While acknowledging that the court should not chase the latest statutory definition affecting the subject, appellants go on to urge that their home is a manufactured home because it was constructed in compliance with the 1976 federal legislation. They argue that the distinction between a "mobile home" and a "manufactured home" is simply that a manufactured home is one constructed in conformity with the standards and regulations promulgated by the Department of Housing and Urban Development whereas a mobile home is not.

We agree that it would be incorrect to change the original undertaking of the parties by following successive statutory definitions. Since there is no indication to the contrary, we must assume that the draftsman of the restriction used the term "mobile home" in the usual and ordinary sense in which it was used when the restriction was written in 1967. In seeking to determine a term's ordinary meaning it is certainly proper and frequently necessary for the court to consult other contemporary documents employing the phrase. These are evidence of the circumstances surrounding its use. "The interpreter must, as far as possible, place himself intellectually in the same circumstances of time and place as was the author of the writing when he made it. *Miller v. Fichthorn*, 31 Pa. 252 (1858)." 3 A. Corbin on Contracts § 536 (1960). A definition contained in a contemporary legislative enactment is not necessarily conclusive, but it may very well be persuasive. The first Texas legislative pronouncement on the subject came in 1969 with the passage of the Uniform Standards Code for Mobile Homes. Its definition of mobile home is not remarkably different from the amended version, as it existed in 1981, found in art. 5221f (by then styled the Texas Manufactured Housing Standards

---

1. Uniform Standards Code for Mobile Homes, ch. 656, §§ 1–13, 1969 Tex.Gen.Laws, 1954–1957 (current version at Tex.Rev.Civ.Stat.Ann. art. 5221f (Vernon 1986)).

Act).[2] The 1969 definition, written only two years after the restrictive covenant in question, read as follows:

(a) 'mobile home' means a movable or portable dwelling constructed to be towed by a motor vehicle on its own chassis, over Texas roads and highways under special permit, connected to utilities, and designed without a permanent foundation for year-round living. It may consist of one or more units that can be telescoped when towed and expanded later for additional capacity, or of two or more units, separately towable but designed to be joined into one integral unit; . . . .

■ The structure in this case preserves the same basic form and serves the same function as the mobile homes of 1967. The dimensions of each section enable them to be moved conveniently on the highways. Each section is equipped with a tongue, axles and wheels so that they may be towed to its location. Although they have been removed, the tongue, axles, and wheels may be reattached should the owner desire to remove it to a new location. Each section has its own permanent chassis. The Gigowski home, in common with mobile homes generally, is secured to the ground by "tie-downs."

What characteristics serve to distinguish the mobile homes of 1967, as a class, from the Gigowski residence? It is acknowledged that the Gigowski home is bigger, stronger, safer, and more comfortable than the vast majority of mobile homes manufactured in 1967. But these are differences in degree, not in any essential or defining quality. To a greater or lesser extent, almost all the machines and equipment with which we are most familiar have been dramatically improved in recent times. We accept this as commonplace. But the most radical advances rarely result in change that so overflows the basic definition of an object so as to require its re-clas-

sification. Airplanes and automobiles have been spectacularly altered and improved over this century, but they remain airplanes and automobiles. A 1981 Cadillac bears little resemblance to a model-T Ford, but it is still an automobile.

It cannot be argued that the Gigowski home is not a mobile home because it is double wide or multi-sectional. Double wide homes were produced in 1967 and the 1969 Texas statute clearly contemplates that mobile homes may be multi-sectional, separately towable, but designed to be joined into one integral unit. It is said that the newer manufactured homes are not as mobile as the 1967 models because their increased size makes their movement a larger undertaking. However undoubtedly their increased strength enables the newer models to withstand the strain of movement much better than the average 1967 "crackerbox" the appellant describes. Nor does the fact that the exterior of the Gigowski home is designed to simulate traditional homes alter its character.

There was no regulatory legislation specifically affecting the mobile home or manufactured housing industry in Texas until the legislature's 1969 enactment of the Uniform Standards Code for Mobile Homes. This established uniform standards for mobile home plumbing, heating, and electrical systems. The act was amended in 1973 to adopt structural standards.[3] The Federal Mobile Home Construction and Safety Standards Act was implemented in 1976 mandating uniform standards for mobile homes throughout the nation.[4] The Gigowski home was built in compliance with the standards set forth in what was called, at the time of the home's construction, the Federal Mobile Home Construction and Safety Standards Act. The federal and state regulations undeniably raised safety and construction standards in the industry. But they gave birth to no new scientific

**2.** Texas Manufactured Housing Standards Act, ch. 625, § 3, 1979 Tex.Gen.Laws 1405.

**3.** Mobile Homes-Tie-Down Standards-Fees-Penalties, ch. 606 § 14, 1973 Tex.Gen.Laws 1673.

**4.** Manufactured Home Construction and Safety Standards, 42 U.S.C. § 5401 (1982).

knowledge. Well built mobile homes were on the market in 1967. Double-wide homes were also available. Although appellant contends otherwise, it strains credulity to believe the technology to build a "double wide" such as the Gigowskis' did not exist in 1967.

One suspects that the term "mobile home" was coined for commercial reasons so as to escape the unpleasant associations suggested by "house trailer." The shoddy construction of the preregulation period did little to diminish the public prejudice against this type of housing. The drafters of restrictive covenants came to proscribe mobile homes as well as house trailers. Now a new name is advanced to describe this type of home. In 1980, one year after the construction of the Gigowski residence, the applicable federal law was amended to substitute "manufactured home" for "mobile home" wherever it appeared in the act.[5] In 1983 the Texas Legislature amended the Texas statute to redefine what had theretofore been a mobile home as a "HUD-code manufactured home" if built after June 15, 1976.[6] Mobile homes are identically defined except that a mobile home must have been built before June 15, 1976. In the statute's contemplation, since 1983, all homes of this class, whether built in one or more sections, are now "HUD-code manufactured homes" if built after June 15, 1976. Perhaps the adoption of a new name for this class of structure will advance their public acceptance. But even should this semantic revolution succeed so that their owners learn to look forward to returning after a hard day to a multi-sectional manufactured home rather than a double wide mobile home, the effect of the restrictions will not be altered. The intent of the draftsman and the property rights of those who purchased in reliance upon his language must still be determined according to the meaning of the words when the covenant was written. They do not depend upon subsequent statutory redefinition.

Covenants would be rickety bulwarks indeed if they could be so easily subverted.

In *Lassiter v. Bliss,* 559 S.W.2d 353 (Tex. 1978), our Supreme Court was called upon to determine if a 12′ × 65′ mobile home, placed upon blocks and with its wheels removed, was permitted in a subdivision subject to a restrictive covenant barring trailers. The court decided that Bliss' mobile home was a trailer within the meaning of the restrictive covenant. In so holding the court said "[t]he term 'trailer' is to be understood in its usual meaning regardless of whether it is referred to or described as a house trailer or mobile home."

The court followed two court of civil appeals decisions which had previously held mobile homes to be trailers. *See Bullock v. Kattner,* 502 S.W.2d 828 (Tex.Civ.App.— Austin 1973, writ ref'd n.r.e.); *Phillips v. Zmotony,* 525 S.W.2d 736 (Tex.Civ.App.— Houston [14th Dist.] 1975), *rev'd on other grounds,* 529 S.W.2d 760 (Tex.1975). In *Bullock* the mobile home's wheels had been removed "permanently connecting it to the lot." The court in *Bullock* confronted the argument that "the determining factor of whether a structure is a trailer is not what possible use might be made of the structure in the future, but what use is actually being made of it at the time in question." The court concluded that since the restriction prohibited the use of trailers as a residence "temporarily or permanently," a trailer or mobile home permanently bound to the earth was also proscribed.

The Gigowski home, in common with mobile homes generally, was manufactured to permit movement. *See City of Brookside Village v. Comeau,* 633 S.W.2d 790, 795 (Tex.1982). It is mobile in that each section has a permanent chassis and comes equipped with a tongue, axles, and wheels that may be reattached. Each section is built to dimensions permitting it to be towed over the highways. The structure conforms in all essential respects to the Texas statutory definition written very shortly after the restrictive covenants in

---

5. Nat'l Mobile Home and Safety Standards Act of 1974, Pub.L. No. 96–399, 94 Stat. 1641 (1980).

6. Manufactured Housing Standards Act, Tex. Rev.Civ.Stat.Ann. art. 5221f (Vernon 1986).

question were filed. It was built to standards required by the National Mobile Home Construction and Safety Standards Act.[7] That it is bigger, better, and more expensive than the great majority of the mobile homes of 1967 does not alter its character. The restriction in this case prohibits the use within the subdivision of "any type of mobile home," either temporarily or permanently. We hold that the Gigowski home is a mobile home within the plain meaning of the restrictive covenant. Points one through six are overruled.

In point of error number seven, the appellants contend that the evidence is both factually and legally insufficient to support the trial court's finding that the presence of the Gigowski home lowered the market value of appellees' property in Harbor Point Subdivision. In points eight and nine they maintain the evidence is legally and factually insufficient to support the trial court's finding that the appellees had suffered irreparable injury for which they had no adequate remedy at law. In point number ten appellants claim the trial court erred in granting a permanent injunction because the appellees failed to establish a distinct and substantial breach of the covenant in question.

■ Don Bullock, a real estate broker called by appellees, testified that the continued presence of the Gigowski home in Harbor point will adversely affect property values in the subdivision. It was his experience that one mobile home led to others. He further testified that a double wide mobile home had generally the same detrimental result as single wide homes. The general rule is that one seeking injunctive relief must establish an actual and substantial injury or an affirmative prospect thereof. *See Gambrell v. Chalk Hill Theatre Co.*, 205 S.W.2d 126 (Tex.Civ.App.—Austin 1947, writ ref'd n.r.e.). There is a well-settled exception to the general rule in restrictive covenant cases. The exception is stated in *Protestant Episcopal Church Council v. McKinney*, 339 S.W.2d 400, 403–04 (Tex.App.1960, writ ref'd):

[A] covenant restricting use of land may be enforced by injunction where a distinct or substantial breach is shown, without regard to the amount of damages caused by the breach, and ... in such cases it is not necessary to show the existence of any particular amount of damages or to show that the injury will be irreparable. (Citations omitted.)

■ While there is no evidence of a specific amount of damages suffered by the appellee homeowners, Bullock's testimony clearly shows that they will suffer probable injury from the continued presence of the Gigowski home in Harbor Point. By placing their mobile home in the subdivision, appellants have done the only act that can be violative of the restrictive covenant's proscription against mobile homes. Their action represents both a distinct and substantial breach of the restrictive covenant. A finding of irreparable injury by the trial court is unnecessary to support the permanent injunction. Points seven through ten are overruled.

In their last point of error, the appellants contend that the trial court abused its discretion in granting the permanent injunction because an adequate remedy at law existed in the form of money damages. The Gigowskis argue that the Harbor Point restrictions specifically express the right of the property owners to bring suit for damages for injury resulting from the violation of the restrictions in addition to their right to "maintain injunction proceedings." They contend that the Gigowskis' expense of removal is great while the damages to the other property owners is slight and that this disproportion between the harm done to appellant and the very limited benefit to the lot owners by the enforcement of the permanent injunction renders it inequitable and oppressive.

■ A remedy at law is not adequate unless that remedy is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief. *Brazos River Conservation*

7. Nat'l Mobile Home and Safety Standards Act of 1974, *supra* note 5.

**22**

*and Reclamation District v. Allen,* 141 Tex. 208, 171 S.W.2d 842, 846 (1943). It is probably impossible at this time to ascertain the damages to the other homeowners with any degree of accuracy. There is evidence that permitting the mobile home to remain in the subdivision will result in a progressive deterioration of property values. However, the ultimate effect of its continued presence might not be known for years. The appellee homeowners' remedy at law is inadequate if their damages cannot be determined with some precision. Lowe, *Injunctions and Other Extraordinary Proceedings,* Texas Practice § 114 at 159 (1973).

 In determining whether it would be inequitable to enforce a restrictive covenant against a particular lot owner, we must weigh the equities of the owner in violation of the covenant against the equities favoring other lot owners who acquired their property on the strength of the restriction. *Cowling v. Colligan,* 158 Tex. 458, 312 S.W.2d 943, 946 (1958). It is difficult to accept the appellants' view that their costs resulting from the enforcement of the injunction are disproportionate to the benefits the other homeowners will receive. Undoubtedly the appellants will incur considerable expense in removing the home. The two sections must be separated carefully and some damage to the decks which were added is, perhaps, inevitable. Also we must bear in mind that the appellants moved the home onto the property despite their actual and constructive knowledge of the restrictions and added on the decks after prompt notification of their neighbors' hostility to the location of a mobile home in the subdivision. We are not persuaded that the costs of relocating the mobile home are likely to be greater than the total of the losses in market value which the other lot owners will probably suffer if injunctive relief is denied. If there is a disproportion between the harm which will ensue from granting injunctive relief and the benefit to be gained thereby, the disproportion must be of considerable magnitude to justify a refusal to enforce the restrictions. *Cowling v. Colligan,* 312

S.W.2d at 946. The enforcement of the permanent injunction granted by the trial court affords the appellees a much more practical, efficient, and prompt remedy than an action for damages. A balancing of the equities or relative hardships does not justify a denial of injunctive relief in this case. Point eleven is overruled.

The judgment is affirmed.