Shelton v. Overmiller 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-384-CV





EMMETT SHELTON AND JOYCE SHELTON,



 APPELLANTS


vs.





JOHN P. OBERMILLER AND VALERIE OBERMILLER,



 APPELLEES


 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT



NO. 91-4014, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING



 





PER CURIAM


 This appeal arises from a suit to enforce restrictive covenants. Appellants, Joyce
and Emmett Shelton, petitioned the district court for an order requiring appellees, Valerie and
John Obermiller, to comply with the restrictive covenants governing a residential subdivision. 
In addition, the Sheltons sought statutory damages and attorney's fees. Tex. Prop. Code Ann.
§ 5.006 (West 1984) & § 202.004(c) (West Supp. 1993). Trial was to the court, which found that
the Obermillers constructed a storage building on their property in violation of the restrictive
covenants. After balancing the equities between the Sheltons and other lot owners on one hand,
and the Obermillers on the other, the trial court rendered judgment allowing the Obermillers'
violation to continue but requiring them to take steps to minimize it. The court awarded the
Sheltons $1,250 in attorney's fees and denied all other relief. The Sheltons appeal the judgment
allowing the storage building to remain and awarding attorney's fees.



BACKGROUND


 The Sheltons developed the subdivision, and when the dispute arose, they owned
two tracts in it. When they subdivided the property for development as a residential
neighborhood, the Sheltons impressed the property with restrictive covenants; these covenants
were filed in the county deed records. The covenants name Joyce and Emmett Shelton as two of
the three members of the Architectural Committee, which regulated the improvements placed on
each lot.

 The Obermillers owned one lot in the subdivision. This lot formed a rectangle,
with the Obermillers' house at one end facing Toreador Drive; the land sloped from the house to
the rear of the lot, where the property opened onto a cul-de-sac, Peace Pipe Path. In 1990, the
Obermillers decided to build a garage or storage building on the part of their property near Peace
Pipe Path. The Obermillers' contractor, Steve Franke, began excavating for the storage building
in mid-June 1990 and finished it in late July. 

 When the Sheltons returned from a three-week trip in August, they noticed the
completed storage building and left word for the Obermillers that the garage violated the
covenants. The Sheltons formally notified the Obermillers of the violation in a letter dated August
15, 1990. By letter to the Sheltons dated February 13, 1991, the Obermillers proposed to build
a wall or fence, with landscaping, to hide the garage. The Obermillers hired a landscape
architect, who drew plans for a wooden gate and a low stone wall that supported a wooden fence
alternating with stone columns; the plans included planting trees around the fence and the storage
building. According to the plans, only the top part of the building would be visible from the
street. These plans were submitted to the Sheltons and were then introduced at trial.

 The Sheltons alleged that the Obermillers' garage violated sections four, nine, and
twelve of the restrictive covenants. These sections required that a garage be part of the main
residence or attached to it; provided that no garage could face the street; and required that the
Architectural Committee approve plans for any structure placed on a lot.

 In its judgment, the trial court ordered the Obermillers to build the wall and gate,
with landscaping, as shown in the landscape artist's rendering. It also ordered the Obermillers
and their successors to maintain the wall, gate, and landscaping in good condition and to use the
storage building only for garage and storage purposes. The court ordered the building to be
demolished if the Obermillers or their successors failed to abide by the conditions in the judgment.



DISCUSSION


 In points of error one through four, the Sheltons claim that neither legally nor
factually sufficient evidence supports the trial court's findings that the Obermillers were not aware
of what the covenants prohibited. In finding of fact two, the trial court stated that before finishing
the storage building, the Obermillers were not aware of the provisions of the restrictive covenants. 
In finding of fact eight, the trial court stated that the Obermillers' violation of the restrictive
covenants was innocent because they were not aware of the covenants' provisions until after they
completed the storage building. 

 The Sheltons argue that under the evidence, the Obermillers had both actual and
constructive notice of the provisions of the covenants. Fact findings two and eight, however, are
directed only at the Obermillers' actual awareness of what the covenants provided. The trial court
based its remedy on the balance of equities between the parties. The court did not determine
whether the law charged the Obermillers with constructive notice or whether they had implied
actual notice; rather, the court tried to devise a fair solution based on the particular facts of the
case. One of the facts relevant to reaching a fair solution was whether the Obermillers actually
knew what the covenants prohibited before finishing their building. We therefore determine
whether the evidence supports the trial court's findings that the Obermillers were not actually
aware of the covenants' prohibitions before they finished their building.

 To review the Sheltons' no-evidence challenge, we consider only the evidence and
inferences tending to support the findings. If any probative evidence supports the findings, they
must be upheld. Responsive Terminal Sys., Inc. v. Boy Scouts of Am., 774 S.W.2d 666, 668
(Tex. 1989); Southern States Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex. 1989). To
review appellants' factual-sufficiency challenge, we consider all the evidence and will set aside
the findings only if the evidence supporting them is so weak, or the evidence to the contrary so
overwhelming, as to make them clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951); West v. Watkins, 594
S.W.2d 800, 802 (Tex. Civ. App.--San Antonio 1980, writ ref'd n.r.e.).

 John Obermiller testified that while he knew that the restrictive covenants existed,
he did not know what they prohibited. His property deed stated that the property was subject to
the restrictive covenants filed in the county deed records. When John bought the house, however,
he did not receive a copy of the covenants. John stated that before he built the building, he had
no idea that he would violate the covenants. He admitted that he was unaware of his violation
because he had not read the restrictions before starting to build and that he made the mistake of
failing to check the covenants before building. Before he read the covenants, John assumed they
were similar to others he knew of, which prohibited trailer houses, apartments, or more than one
family's living on a lot. 

 During excavation for the storage building, Jeffrey Dochen, Joyce Shelton's son
and a partner in the Sheltons' real estate business, drove up to see the site. Steve Franke
explained to Dochen that the Obermillers were building a tennis court and a garage, with a
driveway to it. Franke told him where the garage would be and what it would look like. Dochen
did not complain or express any reservations about the project, but seemed concerned only that
enough space be left for an easement. John Obermiller learned about the meeting with Dochen
from Franke; the episode gave Obermiller no reason to believe that the Sheltons objected to the
storage building. 

 Although the construction of the storage building was plainly visible from the
adjacent street, John Obermiller testified that no one told him while it was being built that it might
violate the covenants. Steve Franke testified that nobody complained to him about the storage
building while he was building it. Joyce Shelton also testified that she did not know of anybody's
complaining to the Obermillers about the building while they were building it. Joyce testified that
she was not alleging that the Obermillers intentionally violated the covenants. 

 John Obermiller's uncontradicted testimony that, before he finished the storage
building, he did not know what the covenants prohibited is some evidence to support the trial
court's findings that the Obermillers were not actually aware of the provisions of the covenants
before finishing their storage building. In addition to this testimony, John's explanation that he
did not receive a copy of the covenants when he bought the house, testimony that Joyce Shelton's
son visited the building site and failed to complain, and testimony that no one else objected to
John or the contractor during construction of the building supply factually sufficient evidence to
support the trial court's findings. We overrule points one through four.

 In points of error five and six, the Sheltons contend that the trial court erred in
concluding that if the Obermillers built the wall and gate, landscaped and maintained it, they
should not be required to demolish the storage building. A suit to enforce restrictive covenants
is an equitable proceeding. Briggs v. Hendricks, 197 S.W.2d 511, 512 (Tex. Civ.
App.--Galveston 1946, no writ); Spencer v. Maverick, 146 S.W.2d 819, 824 (Tex. Civ. App.--San
Antonio 1941, no writ); see Cowling v. Colligan, 312 S.W.2d 943, 945 (Tex. 1958). The trial
court here balanced the equities between the Obermillers and the other lot owners, including the
Sheltons, in deciding that it would be inequitable to enforce the covenants against the Obermillers. 
When a trial court refuses to enforce a restrictive covenant based on a balance of the equities, the
disproportion between the harm to the violator and the benefit to the other lot owners caused by
enforcing it must be considerable. Cowling, 312 S.W.2d at 946; Gigowski v. Russell, 718 S.W.2d
16, 22 (Tex. App.--Tyler 1986, writ ref'd n.r.e.); Gunnels v. North Woodland Hills Community
Ass'n, 563 S.W.2d 334, 338 (Tex. Civ. App.--Houston [1st Dist.] 1978, no writ). We review the
trial court's decision not to enforce the restrictive covenants for an abuse of discretion. E.g.,
Gigowski, 718 S.W.2d at 21-22; Radney v. Clear Lake Forest Community Ass'n, 681 S.W.2d 191,
198 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.); see generally Priest v. Texas Animal
Health Comm'n, 780 S.W.2d 874, 875-76 (Tex. App.--Dallas 1989, no writ) (trial court's decision
to grant or deny permanent injunction is reviewed for abuse of discretion).

 John Obermiller testified that he decided to build the storage building because he
needed room to store his boat, wagon, and horse trailer. Before building the garage, people
dumped garbage and tree limbs on the lower end of his lot because it appeared to be vacant. He
thought that by developing the property he could eliminate the dumping. The Obermillers wanted
to build a tennis court as well and initially planned to put the storage building nearer their house,
with the tennis court at the rear of the property. Around March 1990, John conferred with his
next-door neighbor Scott Willson about where to place the court and garage. The Willsons
preferred to have the garage built lower on the Obermillers' property, closer to their lot, and the
Obermillers built accordingly. Apart from the Sheltons, none of the neighbors complained to the
Obermillers about their building.

 Photographs of the storage building admitted at trial showed a light-colored
building with a sloped roof and three garage doors that faced Peace Pipe Path. The building was
not completely visible from the street, but was partially hidden by trees and shrubs. One resident
of the subdivision testified that the storage building was not an eyesore and that it was built to
blend with the Obermillers' house. Jim Frederick, a real estate appraiser, described the building
as nondescript, "plain vanilla," and neither handsome nor ugly. 

 John Obermiller used the storage building several times a week in the summer,
though only once or twice a month in the winter. He testified that he spent $28,000 to have the
garage built. Steve Franke verified that the building cost the Obermillers $28,000 to construct
and estimated that it would cost $5,000 to demolish. Thomas Gardner, a real estate appraiser,
testified that the storage building added value to the Obermillers' property because it provided
necessary storage space.

 The Sheltons introduced the testimony of Jim Frederick that restrictive covenants
are placed on property to preserve the property values of all owners in a subdivision. He believed
that the Obermillers' violation of the covenants would reduce the value of other properties in the
subdivision. Joyce Shelton and several other lot owners in the subdivision expressed concern that
the violation would diminish the value of their properties. Frederick stated that the danger to
values lay in a prospective homebuyer's perception that the Obermillers' violation might lead to
others. Again, Shelton and other property owners in the subdivision testified that they believed
the Obermillers' violation would make it harder to enforce the covenants against later violations. 
Frederick, however, could not quantify the diminution in market value that the Obermillers'
violation would cause to the surrounding properties.

 Scott Willson testified that he did not think the location of the storage building
diminished the value of his property. Another property owner in the subdivision, whose house
was for sale, stated that he had no indication that the Obermillers' garage posed a problem to his
ability to sell his house. 

 The landscape artist's plans for the proposed gate and wall showed that from the
street only the top part of the storage building would be visible. While one resident of the
subdivision testified that the proposed wall would be detrimental to the appearance of Peace Pipe
Path, another property owner testified that in his opinion the wall would be beautiful and would
more than offset any objection to the presence of the storage building. Thomas Gardner testified
that the proposed wall and landscaping were aesthetically pleasing and would improve the
appearance of Peace Pipe Path. Jim Frederick stated that the proposed wall was handsome and
that, if built, it would help the appearance of the street.

 As to the proposed wall's effect on property values in the subdivision, Frederick
testified that the wall would not offset the potential decrease in value caused by the perception that
the Obermillers' violation set a precedent. He thought that the wall would alleviate the problem,
however. One neighbor in the subdivision testified that she did not believe that the wall would
enhance her property. Another property owner testified that in his opinion neither the garage nor
the wall would affect his ability to resell his property. 

 In determining the harm caused by enforcing the covenants, the trial court could
properly have considered that demolishing the building would cost the Obermillers $33,000,
$28,000 to construct the building and $5,000 to remove it. The Obermillers would also lose
valuable storage space and incur the risk that people would again dump refuse on their lot. 

 In evaluating the benefit to other lot owners of enforcing the covenants, the trial
court could have considered testimony that the storage building would reduce surrounding
property values. But the court could have believed from the evidence that, although the storage
building was functional rather than aesthetic in appearance, it was not unsightly; the court could
also have believed that the proposed wall and gate would hide most of the storage building from
view. The court could have concluded that the proposed wall and gate were attractive and would
mitigate any decrease in property values caused by the violation. 

 The trial court could also have borne in mind that the Obermillers did not intend
the violation and that once the Sheltons pointed it out, the Obermillers tried to find a compromise
to minimize the building's visual disruption. E.g., Gigowski, 718 S.W.2d at 22. From the
evidence presented, the trial court could have determined that the costs of enforcing the covenants
were disproportionate to the benefits to the other lot owners. The trial court did not specifically
find that, if the Obermillers built the wall, allowing the storage building to stand would cause
relatively minimal harm to the lot owners. However, the court's findings of fact and conclusions
of law show that it balanced the equities, and the evidence supports the implied finding that the
lot owners would suffer relatively minimal harm. Tex. R. Civ. P. 299. We therefore hold that
the trial court did not abuse its discretion by refusing to order the Obermillers to demolish the
storage building.

 The Sheltons further contest the effectiveness of the statement in the trial court's
judgment that, in spite of the Obermillers' violation, the covenants would remain in force on all
lots. The Sheltons rely on Cowling, in which the trial court released a border lot in a residential
subdivision from residential restrictions based on changed conditions outside the subdivision, but
stated that the restriction would remain in force against all other lots in the subdivision. Cowling,
312 S.W.2d at 944. The supreme court recognized that the trial court's judgment was ineffective
to prevent the removal of other lots from the restriction as the changed conditions encroached. 
In effect, the trial court's judgment might cause more lots to be released from the restrictions if
development continued. The supreme court therefore held that changed conditions outside a
residential subdivision do not justify releasing a border lot from residential restrictions. Cowling,
312 S.W.2d at 946-47.

 Here, in contrast, the judgment is not based on changed conditions. The concern
in Cowling that a precedent would be set for removing additional lots from the restriction as the
area developed is not present. The trial court's decision allowing the storage building to remain,
if walled and landscaped, is based on the particular facts and equities presented. We overrule
points five and six. 

 In point of error seven, the Sheltons argue that the trial court erred in awarding
them only half of their reasonable attorney's fee. The Sheltons sought to recover reasonable
attorney's fees as allowed by the Property Code. Tex. Prop. Code Ann. § 5.006 (West 1984). 
At trial, the parties stipulated that $2,500 was a reasonable fee for the Sheltons' attorney. In its
judgment, the trial court ordered the Obermillers to pay the Sheltons $1,250, half of their
reasonable attorney's fee. 

 Section 5.006 authorizes the trial court to award reasonable attorney's fees to the
prevailing party in a suit based on breach of a restrictive covenant. In determining the amount
of the fee, the court must consider the listed factors, which include "any other factor." Prop.
Code § 5.006(b). The amount of a reasonable attorney's fee is a question of fact to be determined
by the trier of fact. Giles v. Cardenas, 697 S.W.2d 422, 429 (Tex. App.--San Antonio 1985, writ
ref'd n.r.e.). The trial court has great latitude in fixing attorney's fees, subject to review for
abuse of discretion. Fonmeadow Property Owners v. Franklin, 817 S.W.2d 104, 105 (Tex.
App.--Houston [1st Dist.] 1991, no writ).

 In their petition, the Sheltons sought an order requiring the Obermillers to comply
with the restrictive covenants. While the trial court found that the Obermillers violated the
covenants, it did not order them to comply by demolishing the storage building. The court's
balancing of the equities enabled it to reach a middle ground between those concerned, neither
requiring full compliance nor tolerating an unmitigated violation. The court stated in its judgment
that it based the award of attorney's fees on the equities between the Obermillers and the other
landowners. Given the partial nature of the relief the Sheltons obtained, the trial court did not
abuse its discretion in awarding the Sheltons only half of their reasonable attorney's fee. We
overrule point seven.

 The judgment of the trial court is affirmed.


[Before Justices Powers, Kidd and B. A. Smith]

Affirmed

Filed: March 31, 1993

[Do Not Publish]