TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00313-CV






John A. Bollier and Leslie J. Bollier, Appellants


v.


Austin Gurdwara Sahib, Inc. d/b/a Gurdwara Sahib Austin, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. D-1-GN-08-000511, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING









NO. 03-09-00317-CV






In re John A. and Leslie J. Bollier, Relators






ORIGINAL PROCEEDING FROM TRAVIS COUNTY



 

M E M O R A N D U M O P I N I O N


 Austin Gurdwara Sahib (AGS), a Sikh religious organization, announced plans for
and began building a temple on their lot in the Bee Caves West Subdivision ("the Subdivision"). 
John and Leslie Bollier, lot owners in the Subdivision, filed suit, seeking a permanent injunction to
enjoin construction of the temple based on property deed restrictions. AGS filed a counterclaim for
defamation. After a bench trial, the trial court denied the Bolliers' requested relief, finding that AGS
had violated the deed restrictions in question but that the Bolliers' suit was barred due to limitations,
waiver, and unclean hands. The trial court also denied relief on AGS's defamation counterclaim. 
On appeal, the Bolliers argue that the trial court abused its discretion in failing to grant a permanent
injunction. We reverse the trial court's judgment denying injunctive relief and remand to the trial
court for the issuance of a permanent injunction and calculation and assessment of court costs and
reasonable attorney's fees.


BACKGROUND

 AGS purchased lot 29 in the Subdivision in March 2003. At the time, the lot had a
mobile home on it, which had been used by the prior owner for residential purposes. Shortly after
purchasing the lot, AGS began holding Sikh religious services in the mobile home, which the parties
refer to as the Mobile Home Temple. In April 2003, AGS erected a permanent sign on the lot that
read, "Austin Gurdwara Sahib," and also included a logo. Dr. Harnek Bains, the president of AGS's
executive committee, testified that attendance at weekly Sunday services has been stable since AGS
began holding services at the Mobile Home Temple in 2003, with roughly 20 to 25 people in
attendance each week. Attendance is higher for special occasions, such as weddings, and at times
attendance has exceeded the 53-person capacity of the Mobile Home Temple.

 In November 2003, AGS obtained a certificate of occupancy from the City of Bee
Cave for the Mobile Home Temple. In order to obtain the certificate, AGS was required to make
several improvements to the property. Improvements included a gravel parking lot with 23 parking
spaces, three parking spaces near the entrance to the Mobile Home Temple that comply with the
Americans with Disabilities Act (ADA), an ADA-compliant entrance ramp and restrooms, and an
improved septic system.

 Bains testified that he told Subdivision residents about the services at the Mobile
Home Temple at the first meeting of a fledgling neighborhood association for the Subdivision, held
in November 2003. Five lot owners were represented at the meeting. Bains was elected vice-president of the neighborhood association, but the group failed to hold regular meetings. Bains
testified that the last time he attended a meeting was in August 2004. Nell Penridge, a lot owner in
the Subdivision, was elected president of the neighborhood association in 2004. Penridge testified
that she has attempted to keep in touch with residents via email, but that she only has contact
information for 17 of the approximately 27 households in the Subdivision, and only five residents
have ever contacted her regarding Subdivision issues. Penridge confirmed that there have been no
meetings of the association since 2004, and Leslie Bollier testified that she was told when she moved
into the subdivision that there was no neighborhood association.

 In 2005, AGS finalized plans to construct a new building in which to hold services,
which the parties refer to as the New Temple. According to the testimony at trial, the New Temple
was to be 21 feet in height with a square footage of between 3,800 and 4,600 square feet. (1) The New
Temple would have a maximum occupancy of 200 people. The plans for the New Temple did not
designate any areas as bedrooms, and included specifications for separate men's and women's
restrooms, separate hand and mop sinks, and a grease trap to prevent kitchen grease from entering
the septic system.

 In September 2005, AGS provided Penridge with plans for the New Temple. 
Penridge emailed information about the plans to the households in the Subdivision for which she had
contact information. The site plans for the New Temple were approved at public meetings by the
City of Bee Cave's Planning and Zoning Commission and City Council. 

 Construction of the New Temple began on December 7, 2007. A ceremony was held
to commemorate the event, and the ceremony was covered by the Austin American-Statesman. 

 In February 2008, Leslie and John Bollier, who had purchased a lot in the Subdivision
in March 2007, filed suit to enforce deed restrictions relating to the use of property in the
Subdivision ("The Use Restriction") and construction of buildings and structures in the Subdivision
("the Structure Restriction"). The Use and Structure Restrictions respectively read:


1. No lot shall be used for other than residential purposes, and no soil or trees shall
be removed for any residential use.


2. No building shall be erected other than single family dwellings with garage. The
floor area of any dwelling shall be not less than 1050 square feet exclusive of garage,
porches, and basement. This square footage requirement shall not apply to mobile
homes. Moved-in structures other than new structures shall be permitted only with
the express permission of the Developer or Property Owner's Association. Storage
sheds, barns, pens, and similar structures shall be permitted provided they are at least
100 ft. from a street. All personal properties shall be kept in enclosed storage with
the exception of operating vehicles. No vehicle in a non-operating condition shall
be permitted to remain on any tract longer than 60 days.


 Eight days after the suit was filed, the court entered a temporary restraining order
enjoining further construction of the New Temple. (2) Leslie Bollier, who is an attorney, then sent a
letter to other residents of the subdivision indicating that she and her husband had filed suit to
enforce the deed restrictions. The letter was co-signed by Misha Spiridonov, (3) another lot owner in
the Subdivision. The letter accused AGS of "hid[ing] the ball" with regard to the construction of the
New Temple and stated that AGS members were acting in line with their own "selfish interests." 
The letter further stated that AGS members claimed that they should be able to use the lot for
"whatever purpose they chose," and warned, "if the restrictive covenants are amended to allow the
Temple's construction, the flood gates will then be open for other non-residential uses of any variety,
and our power will be stripped to oppose them and protect our properties." The letter encouraged
residents not to sign any petitions seeking to amend the deed restrictions in the Subdivision.

 On March 2, 2008, Leslie Bollier noticed AGS members driving slowly around the
neighborhood for more than three hours. Bollier testified that, after three other neighbors called her
to report similar behavior, including AGS members taking pictures and notes outside of other lots
in the Subdivision, she called the police on a non-emergency number. Bollier testified that she was
routed to 911, and though she specifically stated that her situation was not an emergency, a 911
operator took her statement. Bollier told the operator that members of AGS were "terrorizing" the
neighborhood, and the operator told her he would dispatch an officer to her house. After she made
the call, an AGS member and his wife stopped in front of her property and approached her, her
husband John, and another Subdivision resident. After Bollier indicated she was frightened, the
AGS member apologized, indicated that he should have approached her sooner to start a dialogue,
and invited her to dinner. During this conversation, police arrived, but said little and did not arrest
or detain anyone. Leslie Bollier testified that she told the police that she was no longer frightened
and that "[t]hese people are nice."

 Roughly one year later, the Bolliers' suit went to trial. After a bench trial on the
merits, the trial court concluded that, though construction of the New Temple violated the Structure
and Use Restrictions, the Bolliers were barred from seeking injunctive relief due to the expiration
of the statute of limitations for bringing a claim, waiver of their claim, and the doctrine of unclean
hands. The trial court denied relief on AGS's defamation counterclaim, and assessed 80 percent of
costs against the Bolliers. Following the trial court's judgment, the Bolliers filed this appeal, which
was assigned to cause number 03-09-313-CV, and a motion for temporary relief and a petition for
a writ of injunction, which were assigned to cause number 03-09-317-CV. 

 On appeal, the Bolliers argue that the trial court erred in concluding that their claim
for injunctive relief was barred by the defenses of limitations, waiver, and unclean hands, and that
the trial court further erred in ordering the Bolliers to pay 80 percent of court costs and denying them
attorney's fees. 


STANDARD OF REVIEW

 We review the trial court's construction of a restrictive covenant de novo. Owens
v. Ousey, 241 S.W.3d 124, 129 (Tex. App.--Austin 2007, pet. denied). 

 We review a trial court's grant or denial of injunctive relief for an abuse of discretion. 
Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002). An abuse of discretion occurs when
a trial court acts in an unreasonable or arbitrary manner, or misapplies the law to established facts. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). When deciding if the
court erred, the factual and legal sufficiency of the evidence are not independent grounds for appeal
but are relevant considerations in our abuse-of-discretion review. Goodson v. Castellanos,
214 S.W.3d 741, 756 (Tex. App.--Austin 2007, pet. denied). (4) If some evidence supports the
trial court's order, the trial court does not abuse its discretion to the extent it is called upon to resolve
fact questions in deciding whether to grant or deny injunctive relief. Davis v. Huey, 571 S.W.2d 859,
862 (Tex. 1978).

DISCUSSION

 In evaluating the Bolliers' claim that AGS violated the Structure Restriction, (5) the trial
court found that AGS had proven three affirmative defenses: limitations, waiver, and unclean hands. 
We address each in turn.


Limitations

 The trial court's second conclusion of law reads, "Plaintiffs' claims for injunctive
relief with regard to Defendant's New Temple and use thereof are barred by limitations." Under the
civil practice and remedies code, the statute of limitations for suits to enforce deed restrictions is four
years. See Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 2008); Girsh v. St. John, 218 S.W.3d
921, 925 (Tex. App.--Beaumont 2007, no pet.). An enforcement action accrues upon breach of the
restrictive covenant. Girsh, 218 S.W.3d at 925. Where there is more than one violation of a deed
restriction, Texas courts have considered whether the prior violation is "insignificant or
insubstantial" when compared to the proposed or new use. Colton v. Silsbee State Bank, 952 S.W.2d
625, 630 (Tex. App.--Beaumont 1997, no pet.). If the prior violation is insignificant or
insubstantial, the statute of limitations accrues upon the subsequent breach of the covenant. Id. 
Otherwise, it accrues from the date of the original violation. Id.

 In this case, the trial court entered a finding of fact stating, "For a period in excess
of four years prior to the filing of suit by Plaintiffs in this case, Defendant has constructed and
continuously maintained parking facilities and other permanent improvements on the Property in
connection with its religious assembly services in violation of the Structure Restriction of the
Restrictive Covenants." The trial record indicates that these improvements, made in 2003, include
the construction of a 23-car gravel parking lot, three ADA-compliant parking spaces in front of the
Mobile Home Temple, an accessibility ramp to the front of the Mobile Home Temple, internal
accessibility improvements to restrooms, improvements to the septic system, and a permanent sign
that is visible from the street. 

 In determining whether the 2003 improvements made by AGS violate the Structure
Restriction, we begin by evaluating the plain language of the restriction. Covenants restricting the
free use of land are not favored by the courts, but will be enforced if they are clearly worded and
confined to a lawful purpose. Wilmoth v. Wilcox, 734 S.W.2d 656, 657 (Tex. 1987);
Jennings v. Bindseil, 258 S.W.3d 190, 194-95 (Tex. App.--Austin 2008, no pet.). When the
language of a restrictive covenant is unambiguous, the Texas Property Code requires that the
restrictive covenant be liberally construed to give effect to its purpose and intent. Tex. Prop. Code
Ann. § 202.003(a) (West 2007); Jennings, 258 S.W.3d at 195. However, the words and phrases in
the restriction must be given their commonly accepted meaning as of the date the restriction was
written and must not be enlarged, extended, changed, or stretched by construction. Wilmoth,
734 S.W.2d at 657-58; Jennings, 258 S.W.3d at 195.

 Regarding prohibitions on construction, the Structure Restriction provides, "No
building shall be erected other than single family dwellings with garage." The plain language of the
Restriction limits only the construction of "buildings," a term that does not normally encompass
parking lots or signs. (6) Further, the Structure Restriction lists other kinds of structures that may be
constructed in the Subdivision pursuant to additional requirements, including moved-in structures,
storage sheds, barns, and pens. This list, however, does not make mention of parking areas, signage,
or accessibility improvements, nor are such improvements similar to the "structures" listed in
the Restriction. 

 Even giving the plain language of the Restriction a liberal construction, we cannot
conclude that the Structure Restriction governs the construction of the gravel parking lot, sign, or
other improvements made to the Mobile Home Temple in 2003. While a large parking lot or sign
might be at odds with the character of a residential neighborhood, we are not required to read the text
of the Structure Restriction to prohibit all improvements that might plausibly be considered non-residential in character. Rather, it is our task to give a fair reading of the Restriction without
enlarging or stretching its terms by construction. Wilmoth, 734 S.W.2d at 657-58; Jennings,
258 S.W.3d at 195. Accordingly, as the plain language of the Structure Restriction indicates that it
does not govern the construction of the parking lot, sign, or other improvements made to the Mobile
Home Temple by AGS in 2003, we conclude as a matter of law that these improvements did not
constitute a violation of the Structure Restriction.

 Even assuming that the improvements by AGS constituted a violation of the Structure
Restriction, the evidence does not support the trial court's finding that "[t]he prior violations by
Defendant of the Use and Structure Restrictions are not insignificant or insubstantial when compared
to the proposed structure and use of the New Temple." See Colton, 952 S.W.2d at 630 (holding that
if prior violation is insignificant or insubstantial, statute of limitations accrues upon subsequent
breach of the covenant). The scope of the construction of the New Temple--a structure of at least
3,800 square feet that measures over 21 feet tall and has an maximum occupancy of
200 people--dwarfs any violations of the Structure Restriction incurred due to the 2003
improvements, including the parking lot and sign. (7) 

 AGS, however, argues that this Court should not compare the parking lot and sign
to the New Temple but instead to "comparable facilities of the New Temple," as the trial court could
have concluded that "the New Temple building by itself is not a violation of the [Structure]
Restriction[.]" (8) As noted above, the Structure Restriction states, "No building shall be erected other
than single family dwellings with garage." The evidence at trial shows that the New Temple
contains numerous features at odds with characterization as a single family dwelling, including a
complete lack of planned bedroom space, separate men's and women's restrooms, separate hand and
mop sinks, and a grease trap in the kitchen. While AGS argues that the New Temple looks like a
residence from the outside and asserts that "internal structures could easily be provided to convert
the New Temple to a residential use," we do not read the Structure Restriction to permit the
construction of any building that could conceivably be converted into a single-family dwelling. (9) 
Accordingly, we disagree that the evidence presented at trial would allow the trial court to conclude
that the New Temple itself did not violate the Structure Restriction. 

 As our analysis shows that there is no evidence to support the trial court's
determination that the 2003 improvements to the lot constituted a violation of the structure
restrictions, or that the 2003 improvements were not insignificant or insubstantial when compared
to construction of the New Temple, we hold that trial court erred in concluding that the Bolliers'
claim is barred by limitations.


Waiver

 The trial court's sixth conclusion of law states, "Plaintiffs and their predecessors in
interest in Plaintiffs' property in the Subdivision waived their right to enforce the Use and Structure
restrictions of the Restrictive Covenants." In order to establish waiver, the defendant has the burden
of proving that the landowners voluntarily and intentionally relinquished their right to enforce the
restrictive covenant. Colton, 952 S.W.2d at 629; Dempsey v. Apache Shores Property Owners Ass'n,
737 S.W.2d 589, 595 (Tex. App.--Austin 1987, no writ). In order to find a waiver of a residential
restrictive covenant, the proposed non-conforming structure must not have a substantially different
effect on the neighborhood than any prior violation. Sharpstown Civic Ass'n v. Pickett, 679 S.W.2d
956, 957 (Tex. 1984). This Court has explained that to carry the burden of demonstrating a waiver
of restrictive covenants, a party must prove that "the violations then existing were so extensive and
material as to reasonably lead to the conclusion that the restrictions had been abandoned." Cox
v. Melson-Fulsom, 956 S.W.2d 791, 794 (Tex. App.--Austin 1997, no pet.). "To put it another way,
the prior violation which has been carried on without objection, if insignificant or insubstantial when
compared to the proposed or new use, will not support a waiver of the new and greater violation." 
Sharpstown, 679 S.W.2d at 958.

 Like its conclusion regarding limitations, the trial court based its conclusion regarding
waiver on the prior violations of the Structure Restriction incurred due to AGS's 2003 improvements
to the lot. As explained above, however, the 2003 improvements to the AGS lot--including the
construction of a parking lot and sign and improvements to the Mobile Home Temple--did not
violate the Structure Restriction. Accordingly, the Bolliers did not waive their right to bring suit due
to a prior violation of the Structure Restriction. Further, even if the 2003 improvements constituted
a violation of the Structure Restriction, the evidence presented at trial does not support the finding
that the prior violations were not "insignificant or insubstantial" when compared to the construction
of the New Temple, for the reasons put forth above. Accordingly, we hold that the trial court erred
in concluding that the Bolliers waived their right to enforce the Structure Restriction. (10) 


Unclean Hands

 The trial court's third conclusion of law states, "Plaintiffs' claims for injunctive relief
are barred by the doctrine of unclean hands." Under the doctrine of unclean hands, a court may
refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct
regarding the issue in dispute. Lazy M Ranch v. TXI Operation, LP, 978 S.W.2d 678, 683 (Tex.
App.--Austin 1998, pet. denied). The equitable maxim is confined to misconduct connected with
the matter in litigation that has in some measure affected the equitable relations between the two
parties. Id. (citing 2 Pomeroy's Equity Jurisprudence § 399 (5th ed.1941)). It does not extend to any
misconduct, however gross, unconnected with the matter in litigation, and with which the opposite
party has no concern. Id. Under Texas law, the doctrine should not be applied unless the party
asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected
without the application of the doctrine. Paciwest, Inc. v. Warner Alan Props., LLC, 266 S.W.3d 559,
571 (Tex. App.--Fort Worth 2008, pet. denied). 

 The trial court found that the Bolliers "engaged in inequitable conduct in connection
with Defendant's use of its property," noting three specific acts. First, "Plaintiff Leslie Bollier
accused Defendant's agents of selfish and devious conduct for the purpose of discouraging support
for an amendment of the Restrictive Covenants to allow Defendant's religious assembly use." 
Second, "Plaintiff Leslie Bollier summoned the police to detain Defendant's agents by falsely
reporting to police that Defendant's agents were driving around the Subdivision in vehicles without
license plates and terrorizing the residents of the Subdivision when such agents were visiting
residents for the purpose of discussing an amendment of the Restrictive Covenants." Third,
"Plaintiff Leslie Bollier encouraged a nonresidential use of property in the Subdivision."

 The actions cited by the trial court, however, do not constitute the kind of conduct
contemplated by the unclean hands doctrine. Texas courts have repeatedly emphasized that the
conduct triggering application of the doctrine must be "connected with the matter in litigation." See
Lazy M Ranch, 978 S.W.2d at 683. (11) Other authority limits the range of conduct even further,
indicating that, in restrictive covenant cases, the unclean hands doctrine applies only when plaintiff
is "guilty of the same actions of which the defendant is accused." 7 Thompson on Real Property
§ 61.07(b)(2)(vii) (2nd ed. 1998) (emphasis added). While Leslie Bollier's acts may have borne
some relationship to AGS's activities in the subdivision, the acts were not "connected with" the
litigation to enforce the deed restrictions. Regarding the trial court's first two examples--"accus[ing
AGS] agents of selfish and devious conduct" in a letter and "falsely reporting to police that
Defendant's agents were . . . terrorizing the residents of the Subdivision"--each occurred after the
underlying lawsuit was filed, and each concerned AGS's efforts to amend the Subdivision's deed
restrictions. Accordingly, neither act constitutes conduct connected with the lawsuit to enforce the
existing Structure and Use restrictions. Cf. Afri-Carib Enters. v. Mabon Ltd., 287 S.W.3d 217,
222-23 (Tex. App.--Houston [14th Dist.] 2009, no pet.) (holding that, in bill of review case, party
that had lied in answer and during hearing on bill of review had not engaged in conduct connected
with subject of underlying litigation). Further, Leslie Bollier's "encourage[ment of] a nonresidential
use of [another] property in the Subdivision" finds its basis in an email she sent to Spiridonov
indicating that she would recommend his woodworking business, which he operated on his property,
to a friend. There is no indication in the record, however, that she ever made such a
recommendation. We conclude that this conduct does not rise to the level of misconduct connected
to the litigation that affects the equitable relations between the parties. See Lazy M Ranch,
978 S.W.2d at 683.

 Even assuming that the Bolliers' actions constitute inequitable conduct under the
unclean hands doctrine, neither the court's findings nor the trial record reflect that Leslie Bollier's
actions "seriously harmed" AGS. See Paciwest, 266 S.W.3d at 571 (explaining that doctrine should
not be applied unless party asserting doctrine has been seriously harmed). AGS contends that
Bollier's actions of sending letters to Subdivision residents and calling the police on March 2, 2008,
"severely compromised" AGS's efforts to amend the deed restrictions by obtaining signatures. AGS
does not present any evidence, however, that Leslie Bollier's letter impermissibly prevented AGS
members from collecting enough signatures to amend the deed restrictions. Further, though the
police were called out to the Subdivision on March 2, 2008, the encounter ended peacefully, with
no AGS members being arrested or detained, and no restrictions placed on AGS activities in the
neighborhood. Finally, AGS presents no evidence that it was in any way harmed by Leslie Bollier's
"encouragement" of Spiridonov's woodworking activities on his property.

 In addition, the trial court's rulings on AGS's counterclaim for defamation suggests
that Leslie Bollier's actions did not cause AGS serious harm. The trial court denied recovery on
AGS's counterclaim, concluding, "Defendant is not entitled to recover damages on its claim for
defamation." This conclusion follows from the trial court's finding that, "Defendant suffered no
actual damages as a result of any statements made by Plaintiff, Leslie Bollier."

 Accordingly, as we find no evidence in the record that AGS was seriously harmed by
Leslie Bollier's actions, we hold that the trial court erred in concluding that the Bolliers' claim was
barred by the doctrine of unclean hands.

 Our analysis leads us to conclude that the trial court abused its discretion in denying
the Bolliers injunctive relief based on the affirmative defenses of limitations, waiver, and unclean
hands. Further, the evidence shows that the proposed construction of the New Temple violated the
Structure Restriction, as the New Temple cannot be characterized as a single-family dwelling. While
courts may refuse to enforce deed restrictions if, in balancing the equities, the disproportion between
the harm the injunctive relief causes and the benefit it produces is "of considerable magnitude," the
equities in this case do not favor AGS. See Cowling v. Colligan, 312 S.W.2d 943, 946 (1958)
(balancing equities in restrictive covenant case); Gigowski v. Russell, 718 S.W.2d 16, 22 (Tex.
App.--Tyler 1986, writ ref'd n.r.e.) (same). In this case, enforcement of the restrictive covenant
requires removal of the New Temple from AGS's lot. While such an undertaking will undoubtedly
be costly, Texas courts have declined to balance the equities in favor of a party who incurs building
costs after receiving actual or constructive notice of a deed restriction prohibiting construction. See
Jim Rutherford Invs., Inc. v. Terramar Beach Comty. Ass'n, 25 S.W.3d 845, 850 (Tex.
App.--Houston [14th Dist.] 2000, pet. denied) (holding that equities did not favor builder who
refused to halt construction after being informed of deed restrictions); Gigowski, 718 S.W.2d at 22
(ordering appellants to remove mobile home despite "considerable expense" when they had actual
and constructive notice of deed restrictions); Winfield v. Lamoyne, No. 05-94-01851-CV, 1995 Tex.
App. LEXIS 2553, at *15 (Tex. App.--Dallas Oct. 16, 1995, writ dism'd) (mem. op.) (ordering
removal of exterior stairway and other improvements when builder had actual and constructive
knowledge of deed restrictions prior to construction). While we recognize that such a result appears
harsh in light of Bains's testimony at trial that $150,000 had been spent on construction of the New
Temple and counsel's assertion at oral argument that construction of the New Temple had been
completed, we must respect the due process of law regardless of result. As explained in Pomeroy's
Equity Jurisprudence,


The defendant who pending the suit changes the existing condition, as by the erection
of a building, does so at his own risk that the right may ultimately prove in the
plaintiff. He cannot in such cases claim the advantage that the balance of injury
might otherwise allow him, because he has acted with full notice of the other party's
claim.


5 Pomeroy's Equity Jurisprudence § 1971 (4th ed. 1919). See also Swaggerty v. Petersen, 572 P.2d
1309, 1316 (Or. 1977) ("Defendant cannot, after suit has been filed and he is thus clearly informed
of both the nature of plaintiffs' claim and their intention to insist upon it, deprive them of their right
to complete relief by increasing his investment, and thus his potential hardship, before the
final decision.").

 Accordingly, as the evidence indicates that the New Temple violates the Structure
Restriction, we reverse and remand to the trial court for entry of a permanent injunction enjoining
construction of and ordering removal of the New Temple. (12) See HEB Ministries, Inc. v. Texas
Higher Educ. Coordinating Bd., 114 S.W.3d 617, 637 (Tex. App.--Austin 2003), rev'd on other
grounds, 235 S.W.3d 627 (Tex. 2007) (remanding to trial court with instructions to enter permanent
injunction); Ireland v. Bible Baptist Church, 480 S.W.2d 467, 474 (Tex. Civ. App.--Beaumont
1972, writ ref'd n.r.e.) (reversing denial of permanent injunction and remanding to the trial court
"with instructions to enter a permanent injunction requiring the defendant to remove the structures
presently upon the premises in question"). We note, however, that as the Bolliers challenge only the
Structure Restriction, our opinion does not address the Use Restriction. Accordingly, our holding
should not be construed to bar or in any other way affect the continued holding of services on the
AGS lot in the existing Mobile Home Temple.


Attorney's Fees

 Based on our reversal of the trial court's denial of injunctive relief due to violations
of the Structure Restriction, we further reverse the portions of the trial court's judgment ordering the
Bolliers to pay 80% of court costs and denying attorney's fees, and remand to the trial court for the
award of reasonable attorney's fees and costs. See Tex. Prop. Code Ann. § 5.006 (West 2003)
(mandating award of attorney's fees and costs to prevailing party in actions based on breach of
restrictive covenant pertaining to real property).


WRIT OF INJUNCTION

 Based on our disposition concerning the Bolliers' direct appeal, cause number 03-09-00313-CV, we dismiss the Bolliers' motion for temporary relief and petition for a writ of injunction,
filed under cause number 03-09-00317-CV, as moot.




CONCLUSION

 We reverse the judgment of the trial court with regard to the injunctive relief sought
by the Bolliers and remand with instructions to enter a permanent injunction requiring AGS to
remove the New Temple from lot 29 of the Subdivision and for the calculation and assessment of
court costs and reasonable attorney's fees. See id. (13) 


__________________________________________

 Diane M. Henson, Justice 

Before Justices Patterson, Puryear and Henson

Affirmed in part; Reversed and Remanded in part

Filed: July 9, 2010
1. Bains testified to two different square-footage estimates of the New Temple, one of
3,892 square feet, and one of 4,545 square feet. For purposes of comparison, the Mobile Home
Temple is 1,226 square feet and is 14 feet tall.
2. The parties later entered into a Rule 11 agreement, which halted construction until the trial
on the merits in March 2009.
3. Spiridonov lives across the street from the New Temple. Leslie Bollier testified that
Spiridonov has a woodworking shop on his property, that he advertises his woodworking on the
internet, and that she had recommended his woodworking to a friend.
4. When reviewing a finding for legal sufficiency, we must credit evidence favorable to the
judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable
fact-finder could not, and inquire whether the evidence presented in the trial court would enable a
reasonable and fair-minded fact-finder to reach the judgment under review. City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005). When considering a factual-sufficiency challenge, we consider
all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of
the evidence that it is clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).
5. The Bolliers do not challenge the trial court's judgment denying injunctive relief based on
violations of the Use Restriction stemming from holding religious services in the Mobile Home
Temple. The Bolliers seek only a reversal of the trial court's denial of injunctive relief based on
violations of the Structure Restriction resulting from construction of the New Temple.
6. The deed restrictions for the Subdivision were executed in August 1976. According to a
1973 edition of the American Heritage Dictionary, "building" is defined as "[s]omething that is built;
a structure; an edifice." American Heritage Dictionary of the English Language 174 (1973). Listed
synonyms include "structure," "edifice," and "pile," with explanatory text indicating, "All these
nouns apply to something built. Building the basic, broadly applicable term of the group. Structure
usually implies considerable size and emphasizes physical make-up with respect to material and
design. Edifice invariably applies to something large or otherwise imposing . . . . Pile suggests the
massiveness of stone and frequently indicates a cluster of buildings." Id.
7. AGS also argues that the New Temple is not "insignificant" or "insubstantial" when
compared to the Mobile Home Temple, which stands 14 feet tall with a square footage of roughly
1,200 square feet and a maximum occupancy of 53 people. Regardless of the merits of this
argument, the trial court made no finding that the Mobile Home Temple itself constituted a violation
of the Structure Restriction. While AGS argues that the non-residential use of the Mobile Home
Temple would also qualify as a violation of the Structure Restriction, such use violates only the Use
Restriction (and perhaps another restriction specifically governing the conditions under which
mobile homes may be placed in lots in the Subdivision). The use would not violate the Structure
Restriction, which governs the conditions under which new structures may be built.
8. The trial court did not explicitly make such a finding, though she stated in making her
ruling, "I also don't believe it's been shown that the [N]ew Temple building cannot be used for
residential purposes. I think it lends itself to that, actually."
9. Bains, AGS's president, testified that the New Temple "basically has all features of a
residence" and could be modified to function as a residence. However, when asked whether the New
Temple was a "residential building," Bains admitted that "[i]t's not residential," and further
conceded that construction of the New Temple would violate the Structure Restriction.
10. The Bolliers also argue that the trial court's finding impermissibly ignores the anti-waiver
provision included in the deed restrictions, which reads, "Failure to enforce any one or more
provisions hereof shall not constitute a waiver thereof or invalidate such provision or provisions." 
While this Court has enforced similar anti-waiver provisions in the past, see TX Far West, Ltd.
v. Texas Invs. Mgmt., Inc., 127 S.W.3d 295, 306 (Tex. App.--Austin 2004, no pet.), we need not
reach the issue in this case.
11. As explained in Lazy M Ranch, "[t]he rule does not go so far as to prohibit a court of
equity from giving its aid to a bad or faithless man or a criminal. The dirt upon his hands must be
his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward
the defendant in that transaction, his hands are as clean as the court can require." 978 S.W.2d 678,
683 (Tex. App.--Austin 1998, pet. denied) (quoting 2 Pomeroy's Equity Jurisprudence § 399 (5th
ed. 1941)). 
12. While the general rule is that one seeking injunctive relief must establish an actual and
substantial injury, "[t]here is a well-settled exception to the general rule in restrictive covenant
cases." Jennings v. Bindseil, 258 S.W.3d 190, 198 (Tex. App.--Austin 2008, no pet.) (citation
omitted).
13. We affirm the trial court's judgment denying relief on AGS's counterclaim, as the parties
do not challenge that portion of the judgment.