# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00313-CV

**John A. Bollier and Leslie J. Bollier, Appellants**

**v.**

**Austin Gurdwara Sahib, Inc. d/b/a Gurdwara Sahib Austin, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. D-1-GN-08-000511, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## NO. 03-09-00317-CV

**In re John A. and Leslie J. Bollier, Relators**

### ORIGINAL PROCEEDING FROM TRAVIS COUNTY

## M E M O R A N D U M   O P I N I O N

Austin Gurdwara Sahib (AGS), a Sikh religious organization, announced plans for and began building a temple on their lot in the Bee Caves West Subdivision ("the Subdivision"). John and Leslie Bollier, lot owners in the Subdivision, filed suit, seeking a permanent injunction to enjoin construction of the temple based on property deed restrictions. AGS filed a counterclaim for defamation. After a bench trial, the trial court denied the Bolliers' requested relief, finding that AGS had violated the deed restrictions in question but that the Bolliers' suit was barred due to limitations,

waiver, and unclean hands. The trial court also denied relief on AGS's defamation counterclaim. On appeal, the Bolliers argue that the trial court abused its discretion in failing to grant a permanent injunction. We reverse the trial court's judgment denying injunctive relief and remand to the trial court for the issuance of a permanent injunction and calculation and assessment of court costs and reasonable attorney's fees.

## BACKGROUND

AGS purchased lot 29 in the Subdivision in March 2003. At the time, the lot had a mobile home on it, which had been used by the prior owner for residential purposes. Shortly after purchasing the lot, AGS began holding Sikh religious services in the mobile home, which the parties refer to as the Mobile Home Temple. In April 2003, AGS erected a permanent sign on the lot that read, "Austin Gurdwara Sahib," and also included a logo. Dr. Harnek Bains, the president of AGS's executive committee, testified that attendance at weekly Sunday services has been stable since AGS began holding services at the Mobile Home Temple in 2003, with roughly 20 to 25 people in attendance each week. Attendance is higher for special occasions, such as weddings, and at times attendance has exceeded the 53-person capacity of the Mobile Home Temple.

In November 2003, AGS obtained a certificate of occupancy from the City of Bee Cave for the Mobile Home Temple. In order to obtain the certificate, AGS was required to make several improvements to the property. Improvements included a gravel parking lot with 23 parking spaces, three parking spaces near the entrance to the Mobile Home Temple that comply with the Americans with Disabilities Act (ADA), an ADA-compliant entrance ramp and restrooms, and an improved septic system.

2

Bains testified that he told Subdivision residents about the services at the Mobile Home Temple at the first meeting of a fledgling neighborhood association for the Subdivision, held in November 2003.  Five lot owners were represented at the meeting.  Bains was elected vice-president of the neighborhood association, but the group failed to hold regular meetings.  Bains testified that the last time he attended a meeting was in August 2004.  Nell Penridge, a lot owner in the Subdivision, was elected president of the neighborhood association in 2004.  Penridge testified that she has attempted to keep in touch with residents via email, but that she only has contact information for 17 of the approximately 27 households in the Subdivision, and only five residents have ever contacted her regarding Subdivision issues.  Penridge confirmed that there have been no meetings of the association since 2004, and Leslie Bollier testified that she was told when she moved into the subdivision that there was no neighborhood association.

In 2005, AGS finalized plans to construct a new building in which to hold services, which the parties refer to as the New Temple.  According to the testimony at trial, the New Temple was to be 21 feet in height with a square footage of between 3,800 and 4,600 square feet.[1]  The New Temple would have a maximum occupancy of 200 people.  The plans for the New Temple did not designate any areas as bedrooms, and included specifications for separate men's and women's restrooms, separate hand and mop sinks, and a grease trap to prevent kitchen grease from entering the septic system.

---

[1]  Bains testified to two different square-footage estimates of the New Temple, one of 3,892 square feet, and one of 4,545 square feet.  For purposes of comparison, the Mobile Home Temple is 1,226 square feet and is 14 feet tall.

3

In September 2005, AGS provided Penridge with plans for the New Temple. Penridge emailed information about the plans to the households in the Subdivision for which she had contact information. The site plans for the New Temple were approved at public meetings by the City of Bee Cave's Planning and Zoning Commission and City Council.

Construction of the New Temple began on December 7, 2007. A ceremony was held to commemorate the event, and the ceremony was covered by the Austin American-Statesman.

In February 2008, Leslie and John Bollier, who had purchased a lot in the Subdivision in March 2007, filed suit to enforce deed restrictions relating to the use of property in the Subdivision ("The Use Restriction") and construction of buildings and structures in the Subdivision ("the Structure Restriction"). The Use and Structure Restrictions respectively read:

1. No lot shall be used for other than residential purposes, and no soil or trees shall be removed for any residential use.

2. No building shall be erected other than single family dwellings with garage. The floor area of any dwelling shall be not less than 1050 square feet exclusive of garage, porches, and basement. This square footage requirement shall not apply to mobile homes. Moved-in structures other than new structures shall be permitted only with the express permission of the Developer or Property Owner's Association. Storage sheds, barns, pens, and similar structures shall be permitted provided they are at least 100 ft. from a street. All personal properties shall be kept in enclosed storage with the exception of operating vehicles. No vehicle in a non-operating condition shall be permitted to remain on any tract longer than 60 days.

Eight days after the suit was filed, the court entered a temporary restraining order enjoining further construction of the New Temple.[2] Leslie Bollier, who is an attorney, then sent a

_____

[2] The parties later entered into a Rule 11 agreement, which halted construction until the trial on the merits in March 2009.

4

letter to other residents of the subdivision indicating that she and her husband had filed suit to enforce the deed restrictions. The letter was co-signed by Misha Spiridonov,[3] another lot owner in the Subdivision. The letter accused AGS of "hid[ing] the ball" with regard to the construction of the New Temple and stated that AGS members were acting in line with their own "selfish interests." The letter further stated that AGS members claimed that they should be able to use the lot for "whatever purpose they chose," and warned, "if the restrictive covenants are amended to allow the Temple's construction, the flood gates will then be open for other non-residential uses of any variety, and our power will be stripped to oppose them and protect our properties." The letter encouraged residents not to sign any petitions seeking to amend the deed restrictions in the Subdivision.

On March 2, 2008, Leslie Bollier noticed AGS members driving slowly around the neighborhood for more than three hours. Bollier testified that, after three other neighbors called her to report similar behavior, including AGS members taking pictures and notes outside of other lots in the Subdivision, she called the police on a non-emergency number. Bollier testified that she was routed to 911, and though she specifically stated that her situation was not an emergency, a 911 operator took her statement. Bollier told the operator that members of AGS were "terrorizing" the neighborhood, and the operator told her he would dispatch an officer to her house. After she made the call, an AGS member and his wife stopped in front of her property and approached her, her husband John, and another Subdivision resident. After Bollier indicated she was frightened, the AGS member apologized, indicated that he should have approached her sooner to start a dialogue,

---

[3] Spiridonov lives across the street from the New Temple. Leslie Bollier testified that Spiridonov has a woodworking shop on his property, that he advertises his woodworking on the internet, and that she had recommended his woodworking to a friend.

5

and invited her to dinner. During this conversation, police arrived, but said little and did not arrest or detain anyone. Leslie Bollier testified that she told the police that she was no longer frightened and that "[t]hese people are nice."

Roughly one year later, the Bolliers' suit went to trial. After a bench trial on the merits, the trial court concluded that, though construction of the New Temple violated the Structure and Use Restrictions, the Bolliers were barred from seeking injunctive relief due to the expiration of the statute of limitations for bringing a claim, waiver of their claim, and the doctrine of unclean hands. The trial court denied relief on AGS's defamation counterclaim, and assessed 80 percent of costs against the Bolliers. Following the trial court's judgment, the Bolliers filed this appeal, which was assigned to cause number 03-09-313-CV, and a motion for temporary relief and a petition for a writ of injunction, which were assigned to cause number 03-09-317-CV.

On appeal, the Bolliers argue that the trial court erred in concluding that their claim for injunctive relief was barred by the defenses of limitations, waiver, and unclean hands, and that the trial court further erred in ordering the Bolliers to pay 80 percent of court costs and denying them attorney's fees.

**STANDARD OF REVIEW**

We review the trial court's construction of a restrictive covenant de novo. *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied).

We review a trial court's grant or denial of injunctive relief for an abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). An abuse of discretion occurs when a trial court acts in an unreasonable or arbitrary manner, or misapplies the law to established facts.

6

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). When deciding if the court erred, the factual and legal sufficiency of the evidence are not independent grounds for appeal but are relevant considerations in our abuse-of-discretion review. *Goodson v. Castellanos*, 214 S.W.3d 741, 756 (Tex. App.—Austin 2007, pet. denied).[4] If some evidence supports the trial court's order, the trial court does not abuse its discretion to the extent it is called upon to resolve fact questions in deciding whether to grant or deny injunctive relief. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

## DISCUSSION

In evaluating the Bolliers' claim that AGS violated the Structure Restriction,[5] the trial court found that AGS had proven three affirmative defenses: limitations, waiver, and unclean hands. We address each in turn.

### *Limitations*

The trial court's second conclusion of law reads, "Plaintiffs' claims for injunctive relief with regard to Defendant's New Temple and use thereof are barred by limitations." Under the

---

[4] When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and inquire whether the evidence presented in the trial court would enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When considering a factual-sufficiency challenge, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

[5] The Bolliers do not challenge the trial court's judgment denying injunctive relief based on violations of the Use Restriction stemming from holding religious services in the Mobile Home Temple. The Bolliers seek only a reversal of the trial court's denial of injunctive relief based on violations of the Structure Restriction resulting from construction of the New Temple.

civil practice and remedies code, the statute of limitations for suits to enforce deed restrictions is four years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 2008); *Girsh v. St. John*, 218 S.W.3d 921, 925 (Tex. App.—Beaumont 2007, no pet.). An enforcement action accrues upon breach of the restrictive covenant. *Girsh*, 218 S.W.3d at 925. Where there is more than one violation of a deed restriction, Texas courts have considered whether the prior violation is "insignificant or insubstantial" when compared to the proposed or new use. *Colton v. Silsbee State Bank*, 952 S.W.2d 625, 630 (Tex. App.—Beaumont 1997, no pet.). If the prior violation is insignificant or insubstantial, the statute of limitations accrues upon the subsequent breach of the covenant. *Id.* Otherwise, it accrues from the date of the original violation. *Id.*

In this case, the trial court entered a finding of fact stating, "For a period in excess of four years prior to the filing of suit by Plaintiffs in this case, Defendant has constructed and continuously maintained parking facilities and other permanent improvements on the Property in connection with its religious assembly services in violation of the Structure Restriction of the Restrictive Covenants." The trial record indicates that these improvements, made in 2003, include the construction of a 23-car gravel parking lot, three ADA-compliant parking spaces in front of the Mobile Home Temple, an accessibility ramp to the front of the Mobile Home Temple, internal accessibility improvements to restrooms, improvements to the septic system, and a permanent sign that is visible from the street.

In determining whether the 2003 improvements made by AGS violate the Structure Restriction, we begin by evaluating the plain language of the restriction. Covenants restricting the free use of land are not favored by the courts, but will be enforced if they are clearly worded and confined to a lawful purpose. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987);

8

*Jennings v. Bindseil*, 258 S.W.3d 190, 194-95 (Tex. App.—Austin 2008, no pet.). When the language of a restrictive covenant is unambiguous, the Texas Property Code requires that the restrictive covenant be liberally construed to give effect to its purpose and intent. Tex. Prop. Code Ann. § 202.003(a) (West 2007); *Jennings*, 258 S.W.3d at 195. However, the words and phrases in the restriction must be given their commonly accepted meaning as of the date the restriction was written and must not be enlarged, extended, changed, or stretched by construction. *Wilmoth*, 734 S.W.2d at 657-58; *Jennings*, 258 S.W.3d at 195.

Regarding prohibitions on construction, the Structure Restriction provides, "No building shall be erected other than single family dwellings with garage." The plain language of the Restriction limits only the construction of "buildings," a term that does not normally encompass parking lots or signs.[6] Further, the Structure Restriction lists other kinds of structures that may be constructed in the Subdivision pursuant to additional requirements, including moved-in structures, storage sheds, barns, and pens. This list, however, does not make mention of parking areas, signage, or accessibility improvements, nor are such improvements similar to the "structures" listed in the Restriction.

Even giving the plain language of the Restriction a liberal construction, we cannot conclude that the Structure Restriction governs the construction of the gravel parking lot, sign, or

---

[6] The deed restrictions for the Subdivision were executed in August 1976. According to a 1973 edition of the American Heritage Dictionary, "building" is defined as "[s]omething that is built; a structure; an edifice." American Heritage Dictionary of the English Language 174 (1973). Listed synonyms include "structure," "edifice," and "pile," with explanatory text indicating, "All these nouns apply to something built. *Building* the basic, broadly applicable term of the group. *Structure* usually implies considerable size and emphasizes physical make-up with respect to material and design. *Edifice* invariably applies to something large or otherwise imposing . . . . *Pile* suggests the massiveness of stone and frequently indicates a cluster of buildings." *Id.*

9

other improvements made to the Mobile Home Temple in 2003. While a large parking lot or sign might be at odds with the character of a residential neighborhood, we are not required to read the text of the Structure Restriction to prohibit all improvements that might plausibly be considered non-residential in character. Rather, it is our task to give a fair reading of the Restriction without enlarging or stretching its terms by construction. *Wilmoth*, 734 S.W.2d at 657-58; *Jennings*, 258 S.W.3d at 195. Accordingly, as the plain language of the Structure Restriction indicates that it does not govern the construction of the parking lot, sign, or other improvements made to the Mobile Home Temple by AGS in 2003, we conclude as a matter of law that these improvements did not constitute a violation of the Structure Restriction.

Even assuming that the improvements by AGS constituted a violation of the Structure Restriction, the evidence does not support the trial court's finding that "[t]he prior violations by Defendant of the Use and Structure Restrictions are not insignificant or insubstantial when compared to the proposed structure and use of the New Temple." *See Colton*, 952 S.W.2d at 630 (holding that if prior violation is insignificant or insubstantial, statute of limitations accrues upon subsequent breach of the covenant). The scope of the construction of the New Temple—a structure of at least 3,800 square feet that measures over 21 feet tall and has an maximum occupancy of 200 people—dwarfs any violations of the Structure Restriction incurred due to the 2003 improvements, including the parking lot and sign.[7]

---

[7] AGS also argues that the New Temple is not "insignificant" or "insubstantial" when compared to the Mobile Home Temple, which stands 14 feet tall with a square footage of roughly 1,200 square feet and a maximum occupancy of 53 people. Regardless of the merits of this argument, the trial court made no finding that the Mobile Home Temple itself constituted a violation of the Structure Restriction. While AGS argues that the non-residential use of the Mobile Home Temple would also qualify as a violation of the Structure Restriction, such use violates only the Use

AGS, however, argues that this Court should not compare the parking lot and sign to the New Temple but instead to "comparable facilities of the New Temple," as the trial court could have concluded that "the New Temple *building* by itself is not a violation of the [Structure] Restriction[.]"[8] As noted above, the Structure Restriction states, "No building shall be erected other than single family dwellings with garage." The evidence at trial shows that the New Temple contains numerous features at odds with characterization as a single family dwelling, including a complete lack of planned bedroom space, separate men's and women's restrooms, separate hand and mop sinks, and a grease trap in the kitchen. While AGS argues that the New Temple looks like a residence from the outside and asserts that "internal structures could easily be provided to convert the New Temple to a residential use," we do not read the Structure Restriction to permit the construction of any building that could conceivably be converted into a single-family dwelling.[9] Accordingly, we disagree that the evidence presented at trial would allow the trial court to conclude that the New Temple itself did not violate the Structure Restriction.

As our analysis shows that there is no evidence to support the trial court's determination that the 2003 improvements to the lot constituted a violation of the structure

Restriction (and perhaps another restriction specifically governing the conditions under which mobile homes may be placed in lots in the Subdivision). The use would not violate the Structure Restriction, which governs the conditions under which new structures may be built.

[8] The trial court did not explicitly make such a finding, though she stated in making her ruling, "I also don't believe it's been shown that the [N]ew Temple building cannot be used for residential purposes. I think it lends itself to that, actually."

[9] Bains, AGS's president, testified that the New Temple "basically has all features of a residence" and could be modified to function as a residence. However, when asked whether the New Temple was a "residential building," Bains admitted that "[i]t's not residential," and further conceded that construction of the New Temple would violate the Structure Restriction.

restrictions, or that the 2003 improvements were not insignificant or insubstantial when compared to construction of the New Temple, we hold that trial court erred in concluding that the Bolliers' claim is barred by limitations.

*Waiver*

The trial court's sixth conclusion of law states, "Plaintiffs and their predecessors in interest in Plaintiffs' property in the Subdivision waived their right to enforce the Use and Structure restrictions of the Restrictive Covenants." In order to establish waiver, the defendant has the burden of proving that the landowners voluntarily and intentionally relinquished their right to enforce the restrictive covenant. *Colton*, 952 S.W.2d at 629; *Dempsey v. Apache Shores Property Owners Ass'n*, 737 S.W.2d 589, 595 (Tex. App.—Austin 1987, no writ). In order to find a waiver of a residential restrictive covenant, the proposed non-conforming structure must not have a substantially different effect on the neighborhood than any prior violation. *Sharpstown Civic Ass'n v. Pickett*, 679 S.W.2d 956, 957 (Tex. 1984). This Court has explained that to carry the burden of demonstrating a waiver of restrictive covenants, a party must prove that "the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions had been abandoned." *Cox v. Melson-Fulsom*, 956 S.W.2d 791, 794 (Tex. App.—Austin 1997, no pet.). "To put it another way, the prior violation which has been carried on without objection, if insignificant or insubstantial when compared to the proposed or new use, will not support a waiver of the new and greater violation." *Sharpstown*, 679 S.W.2d at 958.

Like its conclusion regarding limitations, the trial court based its conclusion regarding waiver on the prior violations of the Structure Restriction incurred due to AGS's 2003 improvements

12

to the lot. As explained above, however, the 2003 improvements to the AGS lot—including the construction of a parking lot and sign and improvements to the Mobile Home Temple—did not violate the Structure Restriction. Accordingly, the Bolliers did not waive their right to bring suit due to a prior violation of the Structure Restriction. Further, even if the 2003 improvements constituted a violation of the Structure Restriction, the evidence presented at trial does not support the finding that the prior violations were not "insignificant or insubstantial" when compared to the construction of the New Temple, for the reasons put forth above. Accordingly, we hold that the trial court erred in concluding that the Bolliers waived their right to enforce the Structure Restriction.[10]

### Unclean Hands

The trial court's third conclusion of law states, "Plaintiffs' claims for injunctive relief are barred by the doctrine of unclean hands." Under the doctrine of unclean hands, a court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute. *Lazy M Ranch v. TXI Operation, LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied). The equitable maxim is confined to misconduct connected with the matter in litigation that has in some measure affected the equitable relations between the two parties. *Id.* (citing 2 Pomeroy's Equity Jurisprudence § 399 (5th ed.1941)). It does not extend to any misconduct, however gross, unconnected with the matter in litigation, and with which the opposite party has no concern. *Id.* Under Texas law, the doctrine should not be applied unless the party

---

[10] The Bolliers also argue that the trial court's finding impermissibly ignores the anti-waiver provision included in the deed restrictions, which reads, "Failure to enforce any one or more provisions hereof shall not constitute a waiver thereof or invalidate such provision or provisions." While this Court has enforced similar anti-waiver provisions in the past, *see TX Far West, Ltd. v. Texas Invs. Mgmt., Inc.*, 127 S.W.3d 295, 306 (Tex. App.—Austin 2004, no pet.), we need not reach the issue in this case.

asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied).

The trial court found that the Bolliers "engaged in inequitable conduct in connection with Defendant's use of its property," noting three specific acts. First, "Plaintiff Leslie Bollier accused Defendant's agents of selfish and devious conduct for the purpose of discouraging support for an amendment of the Restrictive Covenants to allow Defendant's religious assembly use." Second, "Plaintiff Leslie Bollier summoned the police to detain Defendant's agents by falsely reporting to police that Defendant's agents were driving around the Subdivision in vehicles without license plates and terrorizing the residents of the Subdivision when such agents were visiting residents for the purpose of discussing an amendment of the Restrictive Covenants." Third, "Plaintiff Leslie Bollier encouraged a nonresidential use of property in the Subdivision."

The actions cited by the trial court, however, do not constitute the kind of conduct contemplated by the unclean hands doctrine. Texas courts have repeatedly emphasized that the conduct triggering application of the doctrine must be "connected with the matter in litigation." *See Lazy M Ranch*, 978 S.W.2d at 683.[11] Other authority limits the range of conduct even further, indicating that, in restrictive covenant cases, the unclean hands doctrine applies only when plaintiff is "guilty of the *same actions* of which the defendant is accused." 7 Thompson on Real Property

___

[11] As explained in *Lazy M Ranch*, "[t]he rule does not go so far as to prohibit a court of equity from giving its aid to a bad or faithless man or a criminal. The dirt upon his hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require." 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied) (quoting 2 Pomeroy's Equity Jurisprudence § 399 (5th ed. 1941)).

14

§ 61.07(b)(2)(vii) (2nd ed. 1998) (emphasis added). While Leslie Bollier's acts may have borne some relationship to AGS's activities in the subdivision, the acts were not "connected with" the litigation to enforce the deed restrictions. Regarding the trial court's first two examples—"accus[ing AGS] agents of selfish and devious conduct" in a letter and "falsely reporting to police that Defendant's agents were . . . terrorizing the residents of the Subdivision"—each occurred after the underlying lawsuit was filed, and each concerned AGS's efforts to amend the Subdivision's deed restrictions. Accordingly, neither act constitutes conduct connected with the lawsuit to enforce the existing Structure and Use restrictions. *Cf. Afri-Carib Enters. v. Mabon Ltd.*, 287 S.W.3d 217, 222-23 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that, in bill of review case, party that had lied in answer and during hearing on bill of review had not engaged in conduct connected with subject of underlying litigation). Further, Leslie Bollier's "encourage[ment of] a nonresidential use of [another] property in the Subdivision" finds its basis in an email she sent to Spiridonov indicating that she would recommend his woodworking business, which he operated on his property, to a friend. There is no indication in the record, however, that she ever made such a recommendation. We conclude that this conduct does not rise to the level of misconduct connected to the litigation that affects the equitable relations between the parties. *See Lazy M Ranch*, 978 S.W.2d at 683.

Even assuming that the Bolliers' actions constitute inequitable conduct under the unclean hands doctrine, neither the court's findings nor the trial record reflect that Leslie Bollier's actions "seriously harmed" AGS. *See Paciwest*, 266 S.W.3d at 571 (explaining that doctrine should not be applied unless party asserting doctrine has been seriously harmed). AGS contends that Bollier's actions of sending letters to Subdivision residents and calling the police on March 2, 2008,

15

"severely compromised" AGS's efforts to amend the deed restrictions by obtaining signatures. AGS does not present any evidence, however, that Leslie Bollier's letter impermissibly prevented AGS members from collecting enough signatures to amend the deed restrictions. Further, though the police were called out to the Subdivision on March 2, 2008, the encounter ended peacefully, with no AGS members being arrested or detained, and no restrictions placed on AGS activities in the neighborhood. Finally, AGS presents no evidence that it was in any way harmed by Leslie Bollier's "encouragement" of Spiridonov's woodworking activities on his property.

In addition, the trial court's rulings on AGS's counterclaim for defamation suggests that Leslie Bollier's actions did not cause AGS serious harm. The trial court denied recovery on AGS's counterclaim, concluding, "Defendant is not entitled to recover damages on its claim for defamation." This conclusion follows from the trial court's finding that, "Defendant suffered no actual damages as a result of any statements made by Plaintiff, Leslie Bollier."

Accordingly, as we find no evidence in the record that AGS was seriously harmed by Leslie Bollier's actions, we hold that the trial court erred in concluding that the Bolliers' claim was barred by the doctrine of unclean hands.

Our analysis leads us to conclude that the trial court abused its discretion in denying the Bolliers injunctive relief based on the affirmative defenses of limitations, waiver, and unclean hands. Further, the evidence shows that the proposed construction of the New Temple violated the Structure Restriction, as the New Temple cannot be characterized as a single-family dwelling. While courts may refuse to enforce deed restrictions if, in balancing the equities, the disproportion between the harm the injunctive relief causes and the benefit it produces is "of considerable magnitude," the equities in this case do not favor AGS. *See Cowling v. Colligan*, 312 S.W.2d 943, 946 (1958)

16

(balancing equities in restrictive covenant case); *Gigowski v. Russell*, 718 S.W.2d 16, 22 (Tex. App.—Tyler 1986, writ ref'd n.r.e.) (same). In this case, enforcement of the restrictive covenant requires removal of the New Temple from AGS's lot. While such an undertaking will undoubtedly be costly, Texas courts have declined to balance the equities in favor of a party who incurs building costs after receiving actual or constructive notice of a deed restriction prohibiting construction. *See Jim Rutherford Invs., Inc. v. Terramar Beach Comty. Ass'n*, 25 S.W.3d 845, 850 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding that equities did not favor builder who refused to halt construction after being informed of deed restrictions); *Gigowski*, 718 S.W.2d at 22 (ordering appellants to remove mobile home despite "considerable expense" when they had actual and constructive notice of deed restrictions); *Winfield v. Lamoyne*, No. 05-94-01851-CV, 1995 Tex. App. LEXIS 2553, at *15 (Tex. App.—Dallas Oct. 16, 1995, writ dism'd) (mem. op.) (ordering removal of exterior stairway and other improvements when builder had actual and constructive knowledge of deed restrictions prior to construction). While we recognize that such a result appears harsh in light of Bains's testimony at trial that $150,000 had been spent on construction of the New Temple and counsel's assertion at oral argument that construction of the New Temple had been completed, we must respect the due process of law regardless of result. As explained in Pomeroy's Equity Jurisprudence,

> The defendant who pending the suit changes the existing condition, as by the erection of a building, does so at his own risk that the right may ultimately prove in the plaintiff. He cannot in such cases claim the advantage that the balance of injury might otherwise allow him, because he has acted with full notice of the other party's claim.

5 Pomeroy's Equity Jurisprudence § 1971 (4th ed. 1919). *See also Swaggerty v. Petersen*, 572 P.2d 1309, 1316 (Or. 1977) ("Defendant cannot, after suit has been filed and he is thus clearly informed

of both the nature of plaintiffs' claim and their intention to insist upon it, deprive them of their right to complete relief by increasing his investment, and thus his potential hardship, before the final decision.").

Accordingly, as the evidence indicates that the New Temple violates the Structure Restriction, we reverse and remand to the trial court for entry of a permanent injunction enjoining construction of and ordering removal of the New Temple.[12]  *See HEB Ministries, Inc. v. Texas Higher Educ. Coordinating Bd.*, 114 S.W.3d 617, 637 (Tex. App.—Austin 2003), *rev'd on other grounds*, 235 S.W.3d 627 (Tex. 2007) (remanding to trial court with instructions to enter permanent injunction); *Ireland v. Bible Baptist Church*, 480 S.W.2d 467, 474 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.) (reversing denial of permanent injunction and remanding to the trial court "with instructions to enter a permanent injunction requiring the defendant to remove the structures presently upon the premises in question").  We note, however, that as the Bolliers challenge only the Structure Restriction, our opinion does not address the Use Restriction.  Accordingly, our holding should not be construed to bar or in any other way affect the continued holding of services on the AGS lot in the existing Mobile Home Temple.

### *Attorney's Fees*

Based on our reversal of the trial court's denial of injunctive relief due to violations of the Structure Restriction, we further reverse the portions of the trial court's judgment ordering the

---

[12]  While the general rule is that one seeking injunctive relief must establish an actual and substantial injury, "[t]here is a well-settled exception to the general rule in restrictive covenant cases." *Jennings v. Bindseil*, 258 S.W.3d 190, 198 (Tex. App.—Austin 2008, no pet.) (citation omitted).

18

Bolliers to pay 80% of court costs and denying attorney's fees, and remand to the trial court for the award of reasonable attorney's fees and costs. *See* Tex. Prop. Code Ann. § 5.006 (West 2003) (mandating award of attorney's fees and costs to prevailing party in actions based on breach of restrictive covenant pertaining to real property).

## WRIT OF INJUNCTION

Based on our disposition concerning the Bolliers' direct appeal, cause number 03-09-00313-CV, we dismiss the Bolliers' motion for temporary relief and petition for a writ of injunction, filed under cause number 03-09-00317-CV, as moot.

## CONCLUSION

We reverse the judgment of the trial court with regard to the injunctive relief sought by the Bolliers and remand with instructions to enter a permanent injunction requiring AGS to remove the New Temple from lot 29 of the Subdivision and for the calculation and assessment of court costs and reasonable attorney's fees. *See id.*[13]

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed in part; Reversed and Remanded in part

Filed:  July 9, 2010

_____

[13] We affirm the trial court's judgment denying relief on AGS's counterclaim, as the parties do not challenge that portion of the judgment.

19