

# NUMBER 13-24-00085-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JACQUELYN K. MORGAN, Appellant,

v.

JOSEPH R. STAN,
HEATHER M. STAN,
AND ROUND 2 OFFROAD, LLC, Appellees.

## ON APPEAL FROM THE 368TH DISTRICT COURT
## OF WILLIAMSON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Cron, and Fonseca**
**Memorandum Opinion by Justice Silva**

Appellant Jacquelyn K. Morgan appeals the trial court's judgment in favor of

appellees Joseph R. Stan, Heather M. Stan, and Round 2 Offroad, LLC (Round 2).[1] By twelve issues, Morgan contends that the trial court erred by denying her requests for injunctive relief, attorney's fees, and costs. Because resolution of Morgan's eighth issue is dispositive, we affirm.

## I.    BACKGROUND

### A.    Live Pleading

On December 17, 2021, Morgan filed her original petition against appellees and 1612 Shenandoah Condominium Association seeking declaratory relief, injunctive relief, and attorney's fees.[2] In her third amended petition filed on May 30, 2023, Morgan pleaded that appellees violated the restrictive covenants governing Shenandoah, Section Two, a residential subdivision in Cedar Park, Texas. Morgan asserted that the subdivision is subject to the following restrictions:

1.    None of said lots shall be used except for residential purposes. Only one single family dwelling may be erected not to exceed two (2) stories in height and an attached or detached enclosed garage may be built provided it is built of materials similar to the main residence. Outbuildings for the purpose of storage and a horse may be erected as long as they also are constructed of materials similar to the main dwelling. All such outbuildings must be properly maintained and kept painted. All dwellings, garages and outbuildings must be constructed of new materials.

2.    No structure of a temporary character, house trailer, tent, shack, garage, barn or other outbuildings shall be used on any of said lots at any time as a residence or for business either temporarily or

---

[1] This case is before the Court on transfer from the Third Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

[2] Morgan also sued 1612 Shenandoah Condominium Association. On July 10, 2023, the trial court dismissed the claims against this entity with prejudice, and it is not a party to this appeal.

permanently.

3.     No dwelling, exclusive of open porches, garages, carports and patios, shall be permitted on any of said lots at a cost of less than $10,000.00 based upon cost levels prevailing on the date these covenants are recorded, it being the intention and purpose of the covenants to assure that all dwellings shall be of a quality of workmanship and materials substantially the same or better than that which can be produced on the date these covenants are recorded at the minimum cost stated herein for the minimum permitted dwelling size. The ground floor area of the main structure, exclusive of one-story open porches and garages, shall be not less than 900 square feet for a one-story dwelling. The ground floor area of the main structure, exclusive of one-story open porches and garages, shall be not less than 800 square feet for a dwelling of more than one story. Any dwelling erected on any lot shall have outside walls of at least twenty-five percent (25%) masonry.

4.     No dwelling shall be located on any of said lots nearer to the front line or nearer to the side street line than the minimum building set-back lines shown on the recorded plat. In any event, no dwelling shall be located on any of said lots nearer than twenty-five feet (25′) to the front lot line, or nearer than ten feet (10′) to any side street line or five feet (5′) from side lot lines of all inside lots. No outbuilding shall be erected where the front will extend in front of the rear of the dwelling and not less than ten feet (10′) from side lines or ten feet (10′) from rear lot lines. For the purposes of this covenant[,] eaves, steps and open porches shall not be considered as a part of a dwelling, provided, however, that this shall not be construed to permit any portion of a building on a lot to encroach upon any other lot.

5.     Easements for the installation and maintenance of utilities and drainage facilities are reserved as recorded in the Records of Williamson County, Texas. Within these easements, with the exception of the side lot line easements, no structure, planting or other materials shall be constructed, placed, altered, or permitted to remain which damages or interferes with the installation, operation, or maintenance of such facilities or impairs the free movement of any public utility company in, on or across said easements.

6.     No noxious or offensive activity shall be carried on upon any of said lots, nor shall anything be done thereon which may be or become an annoyance or nuisance to the [subdivision].

7.     No part of any of said lots shall ever be used for a business or

3

commercial purpose or for carrying on any trade or profession, whether temporary or permanent.

8.   No oil drilling, oil development operations, oil refining, quarrying, or mining operations of any kind shall be permitted upon or in any of said lots, nor shall oil wells, tanks, tunnels, mining excavations, or shafts be permitted upon or in any of them. No derrick or other structure designed for use in boring for oil or natural gas shall be erected, maintained or permitted upon any of said lots.

9.   No lot may be resubdivided unless approved in writing by the architectural control committee [(ACC)] hereinafter created. No roadway easement shall ever be granted across any lot, unless approved in writing by the [ACC].

10.  None of said lots shall be used or maintained as a dumping ground for rubbish. Trash, garbage, or other waste shall not be kept except in sanitary containers. All incinerators or other equipment for the storage or disposal of such materials shall be kept in a clean and sanitary condition.

11.  No building shall be erected, placed or altered on any lot until the construction plans and specifications, and a plan showing the location of the structure on the lot, have been approved by the [ACC] as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. The [ACC] is composed of Wiley D. Pringle, Howard D. Pringle and Scott Moore. A majority of the [ACC] may designate a representative of the [ACC] to act for it. In the event of death or resignation of any member of the committee, the remaining members shall have full authority to designate a successor. Neither the members of the [ACC], nor its designated representative, shall be entitled to any compensation for services performed pursuant to this covenant. At any time the then record owners of a majority of the lots shall have the power through a duly recorded written instrument to change the membership of the [ACC] or to withdraw from the [ACC] or restore to it any of its powers and duties.

12.  Fences may be erected to enclose the rear yards of dwellings not to exceed six feet (6′) in height and not to extend farther than the front of the building and must be erected with new materials. Front yard fences may be built provided they are a chain link variety and do not exceed four feet (4′) in height.

4

13. No livestock or poultry of any kind shall be raised, bred, or kept on any tract, other than dogs, cats, or other household pets not raised, bred, or kept primarily for commercial purposes; however, one horse may be kept on a tract if it equals one-half (1/2) acre or more, and is properly housed and fenced at the rear of said tract and not raised, bred or used for commercial purposes. Any outbuilding and lot area used for the purpose of housing horses must be kept in a sanitary condition.

14. No signs of any kind shall be displayed for public view on any lot except reasonable signs advertising the property for sale or rent or advertising the building, architect or supplies during construction, without the prior written consent of the [ACC] hereinabove created.

15. The [ACC]'s approval or disapproval, as required in these covenants, shall be in writing. In the event the [ACC], or its designated representative, fails to approve or disapprove within thirty (30) days after plans and specifications have been submitted to it, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.

16. It is further provided that, in order to prevent undue hardship upon any owner or owners of any of said lot or lots, variance from the restrictions above set out as to size and cost of the structure, as to the percentage of masonry construction, and as to minor changes in location of the structure upon the respective lot or lots, may be granted by a majority of the [ACC] above designated, said approval of variances to be by instrument in writing to be duly acknowledged and to be recorded in the Deed Records of Williamson County, Texas if and when such approval of variances shall ever be granted.

17. These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty (30) years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years unless an instrument signed by a majority of the then owners of the lots in Shenandoah, Section Two [subdivision] (2), has been recorded, agreeing to change said covenants, conditions and restrictions, in whole or in part.

18. Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or to recover damages.

19.	Invalidation of any one of these covenants by judgment or a court order shall in nowise affect any of the other provisions, which shall remain in full force and effect.

These restrictions were recorded in the Williamson County records in 1971, and signed by Wiley, Howard, and Moore. Morgan alleged in her live pleading that the Stans owned 1612 Shenandoah Drive and she owned 1616 Shenandoah Drive. Morgan also asserted that both lots are located in the subdivision and are governed by the restrictions. According to Morgan, Joseph "acted as a real estate broker in a real estate transaction" and his brother-in-law, Fernando Mendoza, purchased the lot from the Stans in 2016. Thereafter, Joseph leased 1612 Shenandoah Drive from Mendoza.

Morgan also pleaded that a building permit was issued by the Cedar Park Building Inspection Division on April 5, 2018. The permit authorized the construction of a metal outbuilding garage at 1612 Shenandoah Drive. In October 2019, Joseph leased a 5,000-square-foot portion of 1612 Shenandoah Drive to John Stefka, owner of Round 2.[3] Morgan claimed that "Round 2 began business operations immediately and after a few days or weeks placed a sign . . . on and near the front of the metal outbuilding." She also alleged this was around the time where she was "first aware that 1612 Shenandoah [Drive] was being used for business purposes by anyone, but specifically by Round 2."

According to Morgan, in December 2020, Mendoza and the Stans declared their ownership interests in 1612 Shenandoah Drive as a condominium association comprised of two units. In January 2020, Mendoza conveyed a "one-half undivided interest in 1612 Shenandoah [Drive]" to the Stans by a general warranty deed. On January 20, 2021, both

_____
[3] According to the record, Round 2 is an offroad vehicle customization business.

of the 1612 Shenandoah Drive units were conveyed to the Stans by Owelty of Partition Deeds.

In her live pleading, Morgan asserted that the Stans violated the restrictions in the following ways:

a.  Erecting an outbuilding where the front extends in front of the rear of the dwelling[;]

b.  Erecting an outbuilding closer than ten feet to the side property line[;]

c.  Construction of an outbuilding using impermissible construction materials[;]

d.  Non-residential use[;]

e.  Construction of an outbuilding for an impermissible purpose[;]

f.  Use of a part of this lot for business purposes[;]

g.  Use of a building on this lot for business purposes[;]

h.  Impermissible [f]encing[;]

i.  Impermissible [s]ignage[; and]

j.  Noxious or [o]ffensive [a]ctivity or [a]cts. . . .

Morgan requested that trial court declare that the restrictions were valid and that appellees were required to bring their property into compliance with said restrictions. She further requested from the trial court to issue an injunction against appellees as well as an award of attorney's fees.

On March 31, 2023, appellees filed a joint amended answer asserting that Morgan's claims were barred by several defenses including "the ambiguity of several of the restrictions sought to be enforced," acquiescence and abandonment, waiver, estoppel, laches, limitations, "changed conditions in the subject area," "failure to mitigate

damages," and unclean hands. Appellees requested that the trial court deny Morgan's request for injunctive relief, dismiss her claims, or in the alternative, render judgment so that she take nothing. They also requested an award of court costs and attorney's fees.

**B.      Bench Trial**

Thomas Griffiths testified that he had lived in the subdivision for fifteen years and was aware of the restrictions. He further testified that the restrictions impacted his decision to purchase in that area. Griffiths claimed that there were no commercial activities when he first bought his home, but there have been since then. He stated that he was a member of the ACC at some point but that enforcement of the restrictions is not one of its functions. Griffiths further stated that he was aware of concrete being poured on the Stans' lot, but he did not file a lawsuit nor try to find any surviving member of the ACC. He was also aware of a boat business, a volunteer fire department building, a commercial photography studio, and an assisted living facility operating in the subdivision. Griffiths believed that the boat business had been in the subdivision since he moved there fifteen years ago, but he clarified by stating that he only knew that they had boats.

Griffiths explained that he had two metal outbuildings on his lot and he did not get the ACC's approval for said outbuildings. When asked why he did not seek the ACC's approval, Griffiths responded:

> Because, after checking with my neighbors to see if there were any objections to my plans, everybody said fine with them; and that . . . was my main concern. I also in the neighborhood d[id] see quite a number of outbuildings and said, "I'll go ahead and build my outbuildings, too."

He further explained that none of the businesses that he had seen in the subdivision posed any inconvenience or annoyance to him. Griffiths acknowledged that he stated at a prior hearing that "No one has been enforcing the deed restrictions."

8

Martin Gonzalez testified that he was employed by Wiley and Howard for approximately thirteen years as their general manager and comptroller for Pringle Real Estate, Inc. He further testified that Wiley and Howard put him on their ACC for the subdivisions they developed. Gonzalez explained that the ACC's purpose was to discuss instances where "somebody needed a variance or when somebody was going to build a house . . . out of the ordinary" in the subdivision. The following exchange occurred during his testimony:

| [Appellees' counsel]: | Did you have any involvement with the Shenandoah ACC after you left the company in 1980? |
|---|---|
| [Gonzalez]: | No. |
| [Appellees' counsel]: | Do you know if the Pringles ever appointed anybody else to be on the ACC with them after you left? |
| [Gonzalez]: | No. |
| | . . . . |
| [Appellees' counsel]: | Okay. Do you recall if any people came to the ACC to ask for approval while you were on the ACC? |
| [Gonzalez]: | I think maybe Mr. Sosa that lived in the back part might have; but other than that, I don't remember any. |
| [Appellees' counsel]: | Okay and I think you've said this—I just want to have you repeat it—that the ACC didn't enforce the deed restrictions, you waited— |
| [Gonzalez]: | No. We were not responsible for enforcing them. We just . . . tried to get involved before they built something so that they would build it in accordance with . . . what was allowed. |

9

| [Appellees' counsel]: | And do you recall . . . anyone in Shenandoah coming to the ACC with problems of somebody violating the deed restrictions? |
|---|---|
| [Gonzalez]: | No. |

Anthony David Gattuso Sr. testified that he had lived in the subdivision for forty-seven years. He further testified that he was aware of "people working there from their home" when asked whether there were any businesses operating in the subdivision. Gattuso testified that the businesses included an assisted living facility, an electrician shop, H&H Marine, known as "the boathouse," a BMW repair shop, a computer repair shop, and a photography studio. He mentioned that some of these businesses have signs. Gattuso estimated that the BMW repair shop had been operating for approximately four or five years. He testified that in general these businesses did not pose any annoyance or traffic problems to him. Gattuso further testified that he met Joseph approximately "when construction ended on [Joseph's] garage." According to Gattuso, he informed Joseph that some of the neighbors were upset with Joseph for putting an "eyesore in a residential neighborhood." Regarding Round 2's business operations, Gattuso claimed that it was "a nightmare" for the subdivision, that there were many vehicles parked on the lot, that there was a big trash dumpster in the front of the lot, and that the business attracts high traffic in the area. However, when asked whether he had sought to enforce the restrictions, Gattuso responded, "No, I have not." Gattuso also did not know if any resident in the subdivision previously took any actions to enforce the restrictions.

Heather testified regarding numerous businesses and other covenant violations located within the subdivision. She stated that H&H Marine had "two boats in their front

10

driveway" and an "engine hanging." She also testified that there was a computer repair shop, a photography studio, Britton AC and Heating, a BMW repair shop, Tower & Turbine Technologies, and others. During Heather's testimony, numerous photographs of the subdivision were admitted into evidence depicting debris and trash on multiple lots, seemingly inoperable vehicles parked in the subdivision, heavy machinery such as a mini lift, metal outbuilding structures similar to her own property, business signage, and fences that were not of the chain link variety. She explained that the photographs were generally significant to demonstrate the lack of enforcement of restrictions in the subdivision. When asked what her perception was about being able to place a business in the subdivision, she responded, "That we could do it." She based those perceptions on the subdivision and stated, "We had driven there . . . for years and [saw] the businesses that were there." Heather also testified that there was a lot that had a "string of cars all facing one direction and then a metal building in the back." She stated that Joseph approached the owners of the property and, according to her, the owners informed Joseph that "they did work on cars for strangers, for people."

Morgan testified that she has lived at 1616 Shenandoah Drive for over forty-five years, she was aware of the restrictions, and one of the important reasons that she purchased the property was because the subdivision was quiet and rural. She explained that she first met Joseph in March of 2021 during a Zoom call. According to Morgan, approximately thirty different subdivision residents were present on the call to discuss "what was going on at 1612 Shenandoah [Drive], because everybody was so upset." She testified that there were about 150 lots in the subdivision. Morgan further testified that at the time of the call, Round 2's building had already been built. She claimed that ever since

11

the building has been on the lot in 2018, she had to alter her driving route because "it's too upsetting and I can't see." In this regard, Morgan stated:

> I go that way because, A, it's extremely upsetting for me to have to see this business—I mean, building that encompasses from the street all the way back to my property line, the entire side of my house. But, also, because there's a big commercial dumpster in the way; there are big, high Jeeps that are taller than my head, in the way, parked on both sides of the street; there's blockage of delivery trucks and 18-wheelers and wreckers and commercial dumpster trucks and all kinds of things, and I can't see to make it safe to go that way, nor can I access through it because the streets are narrow.

In addition, she testified that she first became aware of the alleged violations related to either the setback lines or outbuilding placement "after the lawsuit had been filed[.]"

Morgan was aware of the assisted living facility and H&H Marine; however, she stated that neither of these businesses created traffic problems nor were an annoyance to the subdivision. She also testified that she was not aware that there was a BMW repair shop in the subdivision until recently. Morgan stated that she has not encountered a traffic problem or any negative impact to the subdivision regarding the BMW repair shop. She also asserted that an inoperable bus as well as a blue tarp on her own property, which covered a pop-up camping trailer, were no longer in the subdivision. Morgan testified that she has a son who suffers from attention-deficit-hyperactivity disorder and was being home schooled. To help facilitate her child's schooling, her father constructed "a manufactured building with siding and roofing to match the house." She further stated that she spoke to a few residents in the area regarding the placement of the building and that "[t]hey understood what [she] was trying to do." Photographic evidence established that her manufactured building was not situated behind the rear of her home. Morgan additionally explained that the building on the Stans' property affected her backyard

12

because the "25-f[oo]t-tall metal building" covered her entire backyard to her left and obstructed her view from watching the sunrise, among other things. She also testified that she was unaware there was a photography studio and a volunteer fire department in the subdivision until she received the discovery.

Morgan disagreed with Heather's prior testimony regarding the purported lack of restriction enforcement in the subdivision. She explained that the subdivision "has this peaceful rural atmosphere" and that Heather's characterization was unfair. However, Morgan agreed that there had been previous violations of the restrictions but "none of which are nuisances or obnoxious or dangerous or offensive." Morgan further acknowledged that besides Round 2, there were no other lots that she considered a business. In general, Morgan asserted that the traffic volume, the activity level, and the appearance of the other properties were not similar to Round 2's business.

On cross examination, Morgan testified that over the last forty-five years, she had discussed violations of the restrictions with her neighbors four times, two of which were prior to the filing of the current lawsuit. However, she further acknowledged that she had no documentation or names pertaining to the four complaints from either herself or other property owners in the subdivision. Morgan testified that the pop-up trailer on her property had been there for ten years before it was moved. In reference to the manufactured building on her property, she stated that she did not request authorization from the ACC to add the building to her property. Morgan agreed that while metal constructions located on various lots in the subdivision that do not match the home were in violation of the restrictions, she had no knowledge of any complaints "through the decades that [she had] lived there." She also confirmed that there were three business signs located in the

13

subdivision: The Texas Property Manager, the computer repair shop, and the photography studio.

Morgan further testified that before Round 2 started operating in the subdivision, she was aware that Joseph had four "cars out front" and a dumpster; however, she waited two years to file the lawsuit because "it took a little while to gather enough people together to figure out how we wanted to proceed, [or] whether we wanted to do a group lawsuit."

Joseph testified that he is married to Heather and owns a lot in the subdivision. He also testified about his real estate background, the history behind the acquisition of his property, and the construction of his building. Joseph stated that a business referred to as "Chevy Mike" does repair work on vehicles. He noted that the outbuilding located on Mike's property did not match the corresponding main home. Later, when asked about the characterization of the subdivision, Joseph stated that, "I looked at the [subdivision], saw all the buildings up, saw the businesses, and I thought this is a good place to put my shop."

Joseph introduced a highlighted map of the lots in the subdivision reflecting over thirty lots which have been resubdivided based on tax office documentation. Regarding whether his property had ever been reported for violations, Joseph testified that an anonymous caller did report a "dividing fence between Units 1 and 2, the house and the shop," but other than that one instance there have been no further investigations or reports related to his property. When asked, "Is this lawsuit the first time you've been sued regarding this property, he replied, "Yes, sir." Joseph testified that neither himself, Heather, nor Mendoza had been sued at the time the building on his property was finished.

14

**C. Findings of Fact and Conclusions of Law**

On September 14, 2023, after the bench trial concluded, the trial court rendered judgment in favor of appellees and ordered that Morgan take nothing. The judgment further stated that "[a]ll relief not expressly granted herein is denied." On November 7, 2023, the trial court entered its findings of fact and conclusions of law:

**FINDINGS OF FACT**

1. [Morgan] currently holds record title to Lot 17, Block B, of Shenandoah, Section Two, a subdivision in Williamson County, Texas, according to the map or plat thereof recorded in Cabinet B, Slide 185-188, Plat Records of Williamson County, Texas, which is referred to locally as 1616 Shenandoah Drive, Cedar Park, Texas 78613.

2. [The Stans] currently hold record title to Units 1 and 2 of the 1612 Shenandoah Condominiums, a two unit condominium project in Williamson County, Texas, together with the associated limited and common elements as defined in that Declaration recorded under Document No. 2020164334, Official Public Records of Williamson County, Texas. The 1612 Shenandoah Condominiums were created on Lot 1, Block B, of the Shenandoah, Section Two [s]ubdivision.

3. The lots in Shenandoah, Section Two [subdivision] are subject to a set of 1971 deed restrictions which are recorded in Volume 539, Page 471, Deed Records of Williamson County, Texas. These restrictions provide for an [ACC] but no homeowners association. Prior to some activity related to this lawsuit, the [ACC] had been inactive since the late 1970s.

4. The Stans purchased their property because of the lack of a homeowners association and the lack of enforcement of the restrictions.

5. In 2018, the Stans built a large garage structure on a portion of their property which is now Unit 2 of the 1612 Shenandoah Condominiums. No lawsuit was filed to enjoin the construction of this garage prior to its completion.

6. In 2019, the Stans leased a portion of their property to [Stefka], owner of [Round 2]. [Round 2] runs an automotive business on the

15

portion of the Stans' property that [Stefka] has leased.

7. There are numerous extensive and material violations of the restrictions throughout the Shenandoah, Section Two subdivision.

8. Owners in the subdivision were aware of the prior violations but failed to take any action to enforce the restrictions.

9. Prior to the filing of this lawsuit, there have been no enforcement actions against any of the lots in Shenandoah, Section Two [subdivision].

10. Several of the existing violations involve activities similar in nature to those of [Round 2].

11. Prior to the filing of this lawsuit, [Morgan] failed to take any action to enforce the restrictions against [appellees].

12. It would be reasonable for a person seeing the number, nature and severity of violations within the subdivision to conclude that the restrictions had been abandoned and enforcement waived.

## CONCLUSIONS OF LAW

1. [Morgan]'s claims are barred by the express terms of the restrictions.

2. [Morgan]'s claims are barred by abandonment and waiver.

3. [Morgan]'s claims are barred by laches.

4. [Morgan]'s claims are barred by the doctrine of "unclean hands."

This appeal followed.

## II. STANDARD OF REVIEW

Morgan raises numerous issues regarding aspects of the trial court's judgment as well as its findings of facts and conclusions of law.[4]

We review a trial court's issuance or denial of injunctive relief for an abuse of

---

[4] We also note that Morgan requested declaratory relief in her live pleading; however, she does not raise any issues related to this request. Therefore, we do not address any portion of the trial court's judgment regarding declaratory relief.

16

discretion. *Operation Rescue–Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 560 (Tex. 1998). "A trial court abuses its discretion when a 'decision is arbitrary, unreasonable, and without reference to guiding principles.'" *In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019) (quoting *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)). To determine the appropriateness of granting a permanent injunction, "the court will consider the injury which may result to the defendant and the public by granting the injunction as well as the injury to be sustained by the complainant if the writ be denied." *Huynh v. Blanchard*, 694 S.W.3d 648, 688 (Tex. 2024) (quoting *Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 618–19 (Tex. 1950)). However, a trial court has no discretion to issue a permanent injunction absent a pleaded and proven cause of action. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 625 n.2 (Tex. 2011) (per curiam). A trial court's "judgment must arise out of a balancing of equities or of relative hardships" in a restrictive covenant case. *Cowling v. Colligan*, 312 S.W.2d 943, 946 (Tex. 1958). "In determining whether it would be inequitable to enforce a restrictive covenant against a particular lot owner, we must weigh the equities of the owner in violation of the covenant against the equities favoring other lot owners who acquired their property on the strength of the restriction." *Gigowski v. Russell*, 718 S.W.2d 16, 22 (Tex. App.—Tyler 1986, writ ref'd n.r.e.) (citing *Cowling*, 312 S.W.2d at 946).

"In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings." *SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 539 (Tex. App.—Eastland 2012, no pet.); *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 147 (Tex. App.—Dallas 2012, no pet.). "[W]hen a party challenges the trial court's findings of fact, . . . we review those findings by the same standards we use in reviewing the

17

sufficiency of the evidence supporting a jury's answers." *Garcia v. Tautenhahn*, 314 S.W.3d 541, 544 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.). "If there is any evidence of a probative nature to support the trial court's judgment, we will not set it aside, and we may not substitute our findings of fact for those of the trial court." *Id*. "Unchallenged findings of fact are binding on the appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding." *Sharifi*, 370 S.W.3d at 147; *Hegar v. El Paso Elec. Co.*, 629 S.W.3d 518, 527 (Tex. App.—Austin 2021, pet. denied); *see also Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) ("We defer to unchallenged findings of fact that are supported by some evidence."). "When . . . the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for sufficiency of the evidence." *Sharifi*, 370 S.W.3d at 147. We review the trial court's findings of fact for both legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether there is legally sufficient evidence to support the finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Id.* The final test for legal sufficiency must always be whether the

18

evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 822.

In reviewing the factual sufficiency of a finding where the party challenging it does not have the burden of proof, as here, we weigh all the evidence in the record and set aside the challenged finding only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust.[5] *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We must defer to the trial court's determinations of witness credibility and demeanor. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We review a trial court's conclusions of law de novo, whether express or implied. *See BMC Software*, 83 S.W.3d at 794; *Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 636 (Tex. App—Tyler 2004, no pet.). "The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.* "We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence." *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). "Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory." *Id.* "Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law." *Id.*

---

[5] We note that it was appellees' burden to prove their affirmative defenses by presenting sufficient evidence to establish said defenses. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156–57 (Tex. 2015).

### III.  ABANDONMENT AND WAIVER

Morgan raises numerous issues on appeal but since we resolve this matter solely based on abandonment and waiver, we only address Morgan's eighth issue.[6] *See* TEX. R. APP. P. 47.1. By her eighth issue, Morgan argues that the trial court erred by concluding that she "waived or abandoned her right to enforce each of the [restrictions]."

### A.  Applicable Law

"Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Bertucci v. Watkins*, 690 S.W.3d 341, 364 (Tex. App.—Austin 2022) (citing *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003)). Restrictive covenants, like other contract provisions, may be waived. *See Sharpstown Civic Ass'n, Inc. v. Pickett*, 679 S.W.2d 956, 958 (Tex. 1984). To establish abandonment or waiver of restrictive covenants, a party must prove that "the violations then existing were so extensive and material as to reasonably lead to the conclusion that the restrictions have been abandoned." *Cox v. Melson-Fulsom*, 956 S.W.2d 791, 794 (Tex. App.—Austin 1997, no pet.).

"In order to find a waiver of a residential restrictive covenant, the proposed non-conforming structure must not have a substantially different effect on the neighborhood than any prior violation." *Bollier v. Austin Gurdwara Sahib, Inc.*, Nos. 03–09–00313–CV and 03–09–00317–CV, 2010 WL 2698765, at *6 (Tex. App.—Austin July 9, 2010, pet. denied) (mem. op.) (citing *Sharpstown*, 697 S.W.2d at 957). Stated differently, if the prior, unobjected-to violations are insignificant or insubstantial when compared to the

---

[6] Morgan also requested declaratory relief in her live pleading; however, she does not raise any issues related to this request. Therefore, we do not address any portion of the trial court's judgment regarding declaratory relief.

20

complained-of use, there is no waiver of restrictive covenants. *See Sharpstown*, 697 S.W.2d at 957–58. A court may refuse to enforce a restrictive covenant "because of the acquiescence of the lot owners in such substantial violations within the restricted area as to amount to an abandonment of the covenant or a waiver of the right to enforce it." *Cowling*, 312 S.W.2d at 945.

Waiver is generally a question of fact to be determined by the factfinder. *See Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 394 (Tex. 2014); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). Factors used to determine if the enforcement of a restrictive covenant has been waived include: the number, nature, and severity of the existing violations; any prior acts of enforcement; and whether it is still possible to realize to a substantial degree the benefits intended through the covenants. *Anderson Mill Mun. Util. Dist. v. Robbins*, 584 S.W.3d 463, 477 (Tex. App.—Austin 2005, no pet.) (citing *Cox*, 956 S.W.2d at 794). "The failure to object to trivial violations does not preclude enforcement of the covenants." *Cox*, 956 S.W.2d at 794 (citing *Stewart v. Welsh*, 178 S.W.2d 506, 508 (Tex. 1944)). Further, "[i]t is well established in Texas that a property owner is not precluded from enforcing a deed restriction which materially affects her merely because she previously failed to complain of a violation which did not materially affect her in the enjoyment of her property." *Id.* (citing *Stewart*, 178 S.W.2d at 508).

## B.    Analysis

To determine if the enforcement of the restrictions in this case have been waived, we analyze the factors discussed above. *See Anderson Mill*, 584 S.W.3d at 477. In doing so, "[w]e defer to unchallenged findings of fact that are supported by some evidence," and therefore, we will proceed to evaluate the sufficiency of the evidence in support of

the trial court's findings concerning abandonment and waiver. *See Tenaska Energy*, 437 S.W.3d at 523; *Sharifi*, 370 S.W.3d at 147.

## 1. Existing Violations

One factor that we consider is the number, nature, and severity of the existing violations. *See Anderson Mill*, 584 S.W.3d at 477. In relation to this factor, the trial court issued the following findings: "There are numerous extensive and material violations of the restrictions throughout the Shenandoah, Section Two subdivision"; "Several of the existing violations involve activities similar in nature to those of [Round 2]"; and "It would be reasonable for a person seeing the number, nature and severity of violations within the subdivision to conclude that the restrictions had been abandoned and enforcement waived."

The evidence at trial supported these findings by establishing that the Stans noticed there were numerous businesses in the area, which was part of the reason they purchased property in the subdivision. It also established that some of these businesses were not located in Section Two; however, there was ample evidence to support the presence of businesses that were located in the subdivision including a computer repair shop, a photography studio, an air conditioning business, a BMW repair shop, an assisted living facility, and a boat business, among others. Of these businesses, the computer repair shop, photography studio, and the assisted living facility had signs posted outside of their business.

Moreover, photographs admitted at trial depicted the BMW repair shop as a large metal outbuilding with multiple vehicles parked near the front of the building, similar to Round 2's business. The proprietor of "Chevy Mike" testified that he does vehicle repair

22

work for "strangers." In addition, "Chevy Mike's" outbuilding was not constructed of materials similar to his main home, as established by Joseph's testimony. Griffiths's testimony established that at least one of these businesses had been in the subdivision for fifteen years. Gattuso also estimated that the BMW repair shop had been in operation for four or five years, and that the assisted living facility had been there for approximately fifteen years. Morgan additionally acknowledged that there were various metal outbuildings located around the area that did not match the main home. These metal outbuildings were depicted in the photographs admitted at trial. Other photographs taken from the subdivision also depicted rubbish, trash and garbage on residential property. In addition, according to photographs and testimony by Heather and Morgan, numerous properties had non-compliant front yard fences such as a wooden fence or a white picket fence. Morgan's front yard fence was also not of the chain link variety as evidenced by subdivision photographs.

Morgan testified that she had an outbuilding on her own lot which was not approved by the ACC that was intended to be used for her child's homeschooling. In relation to this outbuilding, photographic evidence established that Morgan's outbuilding extended in front of the rear of her home. Griffiths's two outbuildings were also not approved by the ACC. In addition, Joseph provided testimony regarding the overwhelming amount of lots that have been subdivided as evidenced by tax documents.

While Morgan concedes that there have been some previous violations of the restrictions, she asserts that appellees "failed to produce any evidence that there has been prior violations . . . comparable in effect on the neighborhood to the violations by [appellees]." In relation to this factor, Morgan specifically argues that appellees "failed to

23

provide any evidence of a single prior violation that meets the [*Sharpstown*] test." *See Sharpstown*, 679 S.W.2d at 958. ("[I]n order to support a waiver of residential restrictions the proposed use must not be substantially different in its effect on the neighborhood from any prior violation.") She focuses her argument on the "high traffic at Round 2" and argues that Round 2's business violations were not comparable to the BMW repair shop's violations. Morgan relies on the testimony adduced at trial and asserts that Heather admitted to the volume of traffic near Round 2 and Heather also noted more vehicles closer to the street than at the BMW repair shop. She also argues that "the offroad vehicle customization business by Round 2 . . . continues to have[] a profound, negative effect on their residential neighborhood, unlike any prior violation." Morgan testified that none of the prior violations were a nuisance, obnoxious, dangerous, or offensive. She additionally contends that none of the other trivial violations "materially affect[ed] her in the enjoyment of her property." Morgan further testified that the metal building on the Stans' property affected her because the "25-f[oo]t-tall metal building" covers her entire backyard to her left and obstructs her view from watching the sunrise. However, the trial court was not required to credit any of the testimony in her favor. *See In re J.O.A.*, 283 S.W.3d at 346. We also find that the contrary evidence does not render the trial court's finding "clearly wrong and manifestly unjust"; thus, the finding is supported by factually sufficient evidence. *See Ortiz*, 917 S.W.2d at 772.

Morgan cites various cases to support her contentions including—*Stewart*; *Sides v. Saliga*, No. 03-17-00732-CV, 2019 WL 2529551, at *13–15 (Tex. App.—Austin June 20, 2019, pet. denied) (mem. op.); and *First State Bank of Corpus Christi v. James*, 471 S.W.2d 868, 874–75 (Tex. App.—Corpus Christi–Edinburg 1971, no writ). *Stewart* dealt

24

with a single restriction related to a fence and established the general theory that a lot owner may still seek to enforce restrictions even if the owner did not attempt to enforce prior restrictions if the prior violations were trivial or did not materially affect the owner. *See Stewart*, 178 S.W.2d at 508. *Sides* involved a subdivision subject to certain restricted covenants—these restrictions "provide[d] that the property shall be used for single-family residential purposes and not for commercial uses; that trash would not be allowed to accumulate; and that firearms could not be discharged." *See Sides*, 2019 WL 2529551, at *1. In *Sides*, there was a substance abuse treatment facility operating in the subdivision for years. *See id.* at *5. Moreover, the trial court found that the Sideses' property had hunting activity, piles of trash, and operation of a home construction business. *See id.* at *14. On the other hand, the Saligas began to operate an event center with hundreds of commercial guests that attracted noise, traffic, and parking concerns, and the Third Court of Appeals held that the previously discussed violations had a substantially smaller impact to the subdivision in comparison to the Saligas' violations. *See id.* at *15.

In *James*, appellee sought an injunction to enforce a residential-use-only restriction against a bank's proposed use of a lot as a parking lot or driveway. *See James*, 471 S.W.2d at 870. The trial was before a jury which answered special issues favorably to appellee. *See id.* Judgment was entered permanently enjoining the bank from using the lot "'for any purpose except private residential use only, for so long as said restrictions remain in force and effect.'" *Id.* On appeal, the bank argued that the trial court erred in holding that the restriction had not been abandoned or waived. *See id.* at 873. The record contained evidence of previous violations of the residential-use-only restriction by a dental office and a real estate office. *See id. a*t 873–74. This Court held that operation of these

25

offices were "merely incidental to the use of each lot as a family residence." *Id.* at 874–75. We also held that "[t]he evidence does not show that the maintenance of the offices in the homes materially affected the use and enjoyment of any lot in the residential section as a home." *Id.* at 874.

However, those cases are distinguishable from the facts of this case in multiple ways. For instance, there is no evidence that Round 2 was operating a massive commercial event center inviting hundreds of guests to the property like in *Sides*; thus we find *Sides* inapposite. *See Sides*, 2019 WL 2529551, at *15. In addition, the facts in *James* are not like that involved in the instant case, which involves a substantial number of violations of various restrictions. *See James*, 471 S.W.2d at 874–75. Therefore, we find *James* inapposite. Moreover, unlike the cited cases, the numerous violations of the restrictions in this case involved multiple properties in the subdivision and several of the restrictions.

In addition, Morgan testified that there were approximately 150 lots in the subdivision and argues that "there are as many as ten lots in Section [Two] violating the restriction prohibiting business use and are used for non-residential purposes," so "the ratio of such lots is less than 7%." We agree with our sister court "that statistics are simply one of many factors to be considered on the waiver issue, regardless of who they favor." *Pebble Beach Prop. Owners' Ass'n v. Sherer*, 2 S.W.3d 283, 292 (Tex. App.—San Antonio 1999, pet. denied). Morgan's assertions alone are not dispositive of her issue on appeal, as the trial court must weigh multiple factors and equities in making a determination related to abandonment and waiver, as it did here. *See Sharpstown*, 697 S.W.2d at 957*; Gigowski*, 718 S.W.2d at 22; *Anderson Mill*, 584 S.W.3d at 477.

26

Based on the evidence, we find that the trial court's findings in relation to this factor are supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 822. We also find that the contrary evidence does not render the findings "clearly wrong and manifestly unjust"; thus, the findings are supported by factually sufficient evidence. *See Ortiz*, 917 S.W.2d at 772. We conclude this factor weighs in favor of abandonment and waiver. *See Anderson Mill*, 584 S.W.3d at 477.

### 2.      Prior Acts of Enforcement

Another factor we look at is any prior acts to enforce the restrictions. *See id.* In relation to this factor, the trial court issued the following findings of fact: "The Stans purchased their property because of the lack of a homeowners association and the lack of enforcement of the restrictions"; "Owners in the [Shenandoah, Section Two] subdivision were aware of the prior violations but failed to take any action to enforce the restrictions"; "Prior to the filing of this lawsuit, there have been no enforcement actions against any of the lots in Shenandoah, Section Two [subdivision]"; and "Prior to the filing of this lawsuit, [Morgan] failed to take any action to enforce the restrictions against [appellees]."

The record demonstrates that the subdivision restrictions were established in 1971. Although the restrictions created an ACC for the approval of proposed variances, the trial court found that the committee has been inactive since the late 1970s, as established by Gonzalez's testimony. Morgan testified that she spoke with neighbors on four occasions regarding enforcement of the restrictions. However, the record contains no evidence showing that any of the subdivision residents nor Morgan herself sought to enforce the restrictive covenants for fifty years—from their enactment in 1971 until Morgan's enforcement action against appellees in December 2021. Gattuso as well as

27

Griffiths also acknowledged the presence of violations and lack of enforcement actions. Morgan explained that before Round 2 started operating in the subdivision, she was aware Joseph had four cars and a dumpster in front of his property; however, she waited two years to file the lawsuit. The record contains no evidence of any proceedings to enforce any of the prior violations in the subdivision prior to the present underlying lawsuit. Moreover, Joseph testified that before moving to the subdivision, it appeared that there was no enforcement of any restrictions based on the number of buildings and businesses that he saw. Heather additionally stated that the Stans had driven around the subdivision for years and noticed the lack of a homeowner's association and the number of businesses in the area. While Morgan did testify that one of the important reasons that she purchased the property was because she was aware of the restrictions and that the subdivision was quiet and rural, the trial court was not required to credit it. *See In re J.O.A.*, 283 S.W.3d at 346.

Accordingly, we find that the trial court's findings in relation to this factor are supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 822. We further find that the contrary evidence does not render the findings "clearly wrong and manifestly unjust"; thus, the findings are supported by factually sufficient evidence. *See Ortiz*, 917 S.W.2d at 772. We conclude this factor weighs in favor of abandonment and waiver.[7] *See Anderson Mill*, 584 S.W.3d at 477.

Under these circumstances, we find that the trial court could have reasonably

---

[7] We note that one of the factors in making a waiver determination includes whether it is still possible to realize to a substantial degree the benefits intended through the covenants. *Anderson Mill Mun. Util. Dist. v. Robbins*, 584 S.W.3d 463, 477 (Tex. App.—Austin 2005, no pet.). The trial court did not make express findings related to this factor. However, the factors noted in *Anderson Mill* are merely considerations relevant in determining whether subdivision restrictions have been abandoned or waived. *See id.*

inferred that all of the restrictions were abandoned and Morgan's attempted enforcement of them waived. *See Densmore v. McCarley*, No. 02-19-00287-CV, 2020 WL 1293696, at *8 (Tex. App.—Fort Worth March 19, 2020, no pet.) (mem. op.) (concluding that evidence concerning extensive and material violations of subdivision restrictions over the course of thirty-five years was legally and factually sufficient to support the trial court's conclusion that the restrictions were abandoned and attempted enforcement of said restrictions waived). We conclude that the trial court did not err when it determined as a matter of law that the restrictions governing Shenandoah, Section Two subdivision were abandoned and waived. *See Sheetz*, 503 S.W.3d at 502. Therefore, the trial court did not abuse its discretion when it denied Morgan's requests for injunctive relief, attorney's fees, and costs related to the enforcement of said restrictions.[8]

## IV.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
16th day of March, 2026.

---

[8] Morgan additionally argues that the trial court erred by concluding that her claims were barred by the express terms of the restrictions as well as by the unclean hands doctrine. She also asserts that the trial court erred by refusing to enforce paragraphs one, four, seven, twelve, and fourteen of the restrictions. Morgan further contends that the trial court erred by denying injunctive relief, attorney's fees and costs. Lastly, she argues that statute of limitations does not bar her claims. In light of our conclusion regarding Morgan's eighth issue, we need not address her remaining arguments. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").